**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 98-4731

ROBERT RUHE,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of West Virginia, at Clarksburg.
Irene M. Keeley, District Judge.
(CR-96-3)

Argued: April 9, 1999

Decided: August 31, 1999

Before MURNAGHAN, WILKINS, and NIEMEYER,
Circuit Judges.

_____

Affirmed in part and vacated and remanded in part with instructions
by published opinion. Judge Murnaghan wrote the opinion, in which
Judge Wilkins joined. Judge Niemeyer wrote an opinion concurring
in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Michael M. Fisher, OFFUTT, FISHER & NORD, Hun-
tington, West Virginia, for Appellant. Zelda Elizabeth Wesley, Assis-
tant United States Attorney, Clarksburg, West Virginia, for Appellee.
**ON BRIEF:** Chad S. Lovejoy, OFFUTT, FISHER & NORD, Hun-

tington, West Virginia, for Appellant. William D. Wilmoth, United States Attorney, Clarksburg, West Virginia, for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Appellant Robert Ruhe was tried and convicted of conspiring to transport stolen property in interstate commerce and aiding and abetting the transportation of stolen property in interstate commerce. Ruhe appeals various aspects of his trial and sentencing. Ruhe asserts that illegally seized evidence was improperly used, that the district court improperly gave the jury a "willful blindness" instruction, that the district court incorrectly refused to admit polygraph evidence and to consider such evidence at sentencing, that the evidence was insufficient to convict him, and that the district court incorrectly valued the stolen aircraft parts for both jurisdictional and sentencing purposes. We affirm the district court in most respects but vacate Ruhe's sentence and remand for re-sentencing.

I.

Appellant Ruhe ("Ruhe" or "Appellant"), had been involved in the aircraft business for over twenty years at the time of the events in question. He owned a facility licensed by the Federal Aviation Administration ("FAA") to overhaul used aircraft parts. He also owned two other aircraft-related businesses. Through these businesses he often bought and sold used aircraft parts via a variety of methods.

In 1984, Gary Byard, a friend of Ruhe, began working at Pratt & Whitney. Eventually Byard joined the engineering department of Pratt & Whitney's Bridgeport, West Virginia facility. One of his job duties there included maintenance of the "scrap cage" in which Pratt & Whitney stored used aircraft parts deemed to be unserviceable and slated for mutilation. After such parts were mutilated they were sold as steel scrap. These parts were designated by placing red tags on them.

2

Sometime around 1993 or 1994 Byard began stealing aircraft parts from the scrap cage and selling them to Ruhe. The main trial issue was whether Ruhe knew that these parts were stolen. Byard never told Ruhe that he was stealing the parts. Byard testified, though, that Ruhe had to know that they were stolen. Ruhe maintained that Byard never told him that they were stolen, and that he assumed that Byard obtained the parts legitimately through his high position at Pratt & Whitney.

For over one year Byard once a week or once a month would bring parts to Ruhe's businesses or his residence (which is located directly next to his businesses). Ruhe would pay Byard directly, or write a check to Byard or one of Byard's family members. Byard testified that sometimes he brought parts he knew Appellant could use, and sometimes Appellant told Byard the parts he needed. Appellant always decided how much to pay Byard for the parts.

Appellant's employees expressed concern to him about the parts purchased from Byard. The aircraft industry apparently has a pedigree system whereby aircraft parts are accompanied by documentation indicating their source and usage. The "red-tagged" parts purchased from Byard lacked such documentation. Additionally, Appellant's employees were concerned by the fact that the red tags accompanying the parts stated "To be scrapped." Several employees suspected that the red-tagged parts were stolen. Some evidence indicated that when employees raised concerns about these parts, Appellant either told them not to worry, or forbade them from exploring the source of the parts.

On the other hand, Appellant presented evidence that he sought out the source of the parts. After one employee questioned him about the parts, Appellant sent a letter to Pratt & Whitney's help desk in Canada, inquiring about the history of two of the parts. Appellant testified that he sent the letter to Pratt & Whitney Canada rather than Pratt & Whitney Bridgeport (where Byard worked) because the Pratt & Whitney help desk in Canada was the designated parts tracing desk. Ruhe also testified that he "grilled" Byard about the source of the parts. Byard's testimony neither supported nor directly contradicted this contention.

3

One of Appellant's ex-employees alerted the FAA hotline to the possibility that Ruhe was using stolen parts. This phone call resulted in a joint investigation into Appellant by the Federal Bureau of Investigation ("FBI") and the FAA. The FBI contacted one of Appellant's employees, Roy Vennekotter, and convinced him to supply them with photocopies of red tags attached to various parts thought to be stolen. Later, Byard was contacted. Byard agreed to cooperate with the FBI and made monitored phone calls to Appellant to discuss the parts. During one phone call Byard mentioned that it would be difficult to continue to obtain parts because there was heightened security at Pratt & Whitney. Appellant asked Byard if he could put Appellant in touch with the true owners of the parts so that Appellant could purchase the parts directly from them.

Byard also arranged to make a "controlled delivery" of stolen parts to Appellant. Based on this controlled delivery, the FBI obtained a warrant to search Appellant's house and business. A number of aircraft parts were seized during that search.[1]

Thereafter, Appellant was arrested and tried for dealing in stolen goods with a value greater than $5,000 transported in interstate commerce under 18 U.S.C.A. § 2314 (West Supp. 1999). Appellant was convicted. The court determined that Appellant's base offense level under the Sentencing Guidelines was four (4). Because the court found that the loss exceeded $70,000, eight (8) additional levels were added under U.S.S.G. § 2B1.1(b)(1)(I) (West 1996 & Supp. 1999). Appellant's adjusted offense level was twelve (12) and he was sentenced to twelve (12) months and one (1) day. Appellant appeals from various aspects of the trial and sentencing.

II.

Appellant argues that he is entitled to a new trial because the government made impermissible references to evidence that should have been suppressed.

The facts surrounding this issue are disturbing. On October 7,
_____

[1] The irregularities in this search will be discussed infra in section II.

4

1995, pursuant to a search warrant, the FBI searched Appellant's house and seized various items. Appellant moved to suppress this evidence, alleging that the warrant was defective on its face in that it failed to describe the items to be seized with particularity. The magistrate judge to which the issue had been assigned agreed, rejecting any good faith exception to the exclusionary rule since the warrant was defective on its face. The district court adopted the magistrate judge's ruling. This Court reversed. The Court did not reach the adequacy of the warrant, instead holding that the good faith exception was applicable because the warrant "was not so facially defective as to preclude reasonable reliance on it." See United States v. Ruhe, 113 F.3d 1233, 1997 WL 269339, at **3 (4th Cir. 1997) (unpublished table disposition).**2**

Throughout each of the stages of the suppression procedure the government maintained that the items which were not identified by serial number in the warrant had been seized because each had a red Pratt & Whitney tag affixed to it, creating probable cause that it had been stolen from Pratt & Whitney's scrap cage. This Court's opinion in Ruhe specifically mentioned the government's representation that the seized parts bore red tags. See Ruhe, 113 F.3d 1233, 1997 WL 269339, at **1 ("each of these parts was prominently marked with a red tag"). When Appellant's counsel went to examine the evidence for the first time in August, 1997, however, not one piece of evidence had a red Pratt & Whitney tag affixed.

The Appellant immediately moved via motion in limine to suppress all of the evidence seized during the search of his home since the basis for the seizure of the parts not identified by serial number in the warrant (probable cause because of the red Pratt & Whitney tags) was apparently false.

Prior to the hearing on this motion, the government stated that it would voluntarily suppress the questionable evidence:

> In light of this discrepancy between [the FBI agent's] testimony and the actual state of the physical evidence and par-

_____

**2 United States v. Ruhe** is cited here and elsewhere in this opinion for the law of the case. See 4th Cir. R. 36(c).

5

> ticularly considering the importance the presence of red tags had on the suppression issue, I have decided that I will treat the parts which did not have red tags as if they were suppressed for having been improperly seized under the search warrant. Accordingly I will only offer into evidence the aircraft parts identified by serial number in the search warrant and the one item identified with a Pratt & Whitney red tag.**3**

(J.A. at 592.) The district court denied the motion in limine.

At trial the government admitted into evidence only three aircraft parts, all three of which had been referenced by a serial number in the warrant. However, the government and government witnesses made numerous references throughout the trial to the other aircraft parts which had been improperly seized.**4**

Appellant first argues that because most of the aircraft parts were illegally seized, all items seized in the search of his home should be suppressed, even those seized legally. We reject this argument. In extreme circumstances even properly seized evidence may be excluded when the officers executing the warrant exhibit a "flagrant disregard for its terms." United States v. Jones, 31 F.3d 1304, 1314 (4th Cir. 1994) (internal quotations omitted). See also United States v. Borromeo, 954 F.2d 245, 246 (4th Cir. 1992); United States v. Medlin, 842 F.2d 1194, 1199 (10th Cir. 1988). The general rule, however, is that items properly seized may still be admitted even when they are obtained at the same time as improperly seized items. See Jones, 31 F.3d at 1314; United States v. Shilling, 826 F.2d 1365, 1369 (4th Cir. 1987), implied overruling on other grounds recognized by United States v. Starkes, 32 F.3d 100, 101 (4th Cir. 1994).

_____

**3** Apparently, on the government's review of the evidence, one of the pieces of evidence was marked with a red tag.
**4** The government argues that because this evidence was admitted without objection, we cannot address Appellant's arguments on appeal. The government is incorrect. The district court ruled upon Appellant's motion in limine. Therefore, that motion served to preserve the issue without the need for additional objections. See United States v. Williams, 81 F.3d 1321, 1325 (4th Cir. 1996).

If the parts did not have red tags when they were seized, then we cannot use words stern enough to condemn the responsible actors for their outrageous and illegal conduct in making false representations before the courts. Such conduct is intolerable at all, and especially so from government agents.

But, we must distinguish the government's conduct before the courts from its conduct when executing the search warrant. The latter conduct was not such a "flagrant disregard" for the terms of the search warrant as to render the entire search unlawful. Appellant has acknowledged previously that the warrant was broadly phrased,[5] allowing seizure of "[a]ircraft components to include but not limited to P-T blades; compressor hubs; P-T wheel; [and] CT disc . . . ." (J.A. at 108.) All of the parts wrongfully seized by the government were the types of items (i.e., aircraft components) described in the warrant. Thus, while the government may not have had probable cause for the questionable seizures, the government's actions were not so extreme as to invalidate the otherwise legal aspects of the search.

Appellant next argues that the government's apparent misrepresentation about the red tags invalidates our decision in United States v. Ruhe, supra, upholding the validity of the search of his home. Appellant is wrong, however. Our decision in Ruhe was not dependent upon the presence of the red tags. That decision merely established that the search as a whole was not illegal because the warrant was not so deficient on its face as to preclude good faith reliance upon it. We were not presented with and did not address the admissibility of any particular items. We think it is clear that if the evidence which was supposed to be red tagged was not so identified, then the seizure of such evidence was unconstitutional. But, this conclusion is separate and independent from our previous conclusion that the search of Ruhe's home was validly conducted in good faith reliance on the warrant. The unconstitutional taint of these seizures did not spread to the trial since the improperly seized evidence was not itself admitted.

Finally, Appellant argues that under the Wong Sun "fruit of the poisonous tree" doctrine, see Wong Sun v. United States, 371 U.S. 471

---

[5] Indeed, Appellant challenged the warrant as being overly broad on its face.

7

(1963), the government should not have been allowed to make any references to the improperly seized items at trial or to any other evidence which was obtained as a consequence of the unlawful search. Once again, Appellant's arguments are unavailing. Generally the exclusionary rule requires the suppression not only of the evidence improperly seized, but "extends as well to the indirect as the direct products of such invasions." Wong Sun, 371 U.S. at 484. The "fruit of the poisonous tree" doctrine recognizes an exception, however, when the evidence in question would have been available from an independent source: "the facts thus obtained[from an illegal search do not] become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others ...." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920), overruled on other grounds by United States v. Havens, 446 U.S. 620 (1980), quoted in Wong Sun, 471 U.S. at 485. The government's other references to the stolen items came from Appellant's check register, Byard's testimony from direct personal knowledge, and the testimony of other witnesses who had personally seen red-tagged parts at Appellant's shop. This evidence was not the fruit of the illegal seizures at Appellant's home. Instead, that search and those seizures were the culmination of an investigation during which this other evidence had already been gathered. The check register was seized during the search of Appellant's home. This seizure, however, was expressly authorized in the warrant. Therefore, although apparently the government was guilty of illegally seizing evidence, no evidence admitted at trial violated the exclusionary rule or the fruit of the poisonous tree doctrine.

III.

The standard of review for determining whether the district court should have given a jury instruction is abuse of discretion. United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996).

To convict Appellant, the government had to prove that he had knowledge that the aircraft parts acquired from Byard had been stolen. A "willful blindness" or "Jewell" instruction "allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." United States v. Schnabel, 939 F.2d

8

197, 203 (4th Cir. 1991). A willful blindness instruction is proper "when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." United States v. Gruenberg, 989 F.2d 971, 974 (8th Cir. 1993), quoted in Abbas, 74 F.3d at 513. If the evidence supports both actual knowledge on the part of the defendant and deliberate ignorance, a willful blindness instruction is proper. Abbas, 74 F.3d at 513.

Appellant argues that the evidence did not support a willful blindness instruction. Appellant turns to Ninth Circuit case law expounding upon the limited nature of that instruction. He cites to the discussion of the instruction in United States v. Jewell , 532 F.2d 697 (9th Cir. 1976):

> [The willful blindness instruction] is, at the same time, an unstable rule, because judges are apt to forget its very limited scope. A court can properly find willful blindness only where it can almost be said that the defendant actually knew. He suspected the fact; he realised its probability; but he refrained from obtaining the final confirmation because he wanted in the event to be able to deny knowledge. This, and this alone, is willful blindness. It requires in effect a finding that the defendant intended to cheat the administration of justice. Any wider definition would make the doctrine of willful blindness indistinguishable from the civil doctrine of negligence in not obtaining knowledge.

Id. at 700 n.7 (quoting Glanville Williams, Criminal Law: The General Part § 57, at 157 (2d ed. 1961)). Appellant also notes that before allowing the use of a willful blindness instruction, the Ninth Circuit requires that the prosecution show that the defendant deliberately avoided obtaining more knowledge "in order to provide him or herself with a defense in the event of prosecution." United States v. Baron, 94 F.3d 1312, 1318 n.3 (9th Cir. 1996). Finally, Appellant points out that many courts have stated that the willful blindness instruction is proper only in "rare circumstances." See , e.g., United States v. Lara-Velasquez, 919 F.2d 946, 951 (5th Cir. 1990).

Appellant cites the following evidence as inconsistent with the willful blindness instruction: (1) Byard was a close friend known to

9

hold a high position in Pratt & Whitney; (2) According to Appellant, Byard never indicated that the aircraft parts were stolen, just that they were designated for scrap; (3) When Appellant's employees began questioning Appellant about the source of these parts, Appellant took two actions to investigate their origins. First, Appellant wrote a letter to Pratt & Whitney's help desk to trace the origin of some of the parts. Second, Appellant says he "grilled" Byard about the legitimacy of the means by which he obtained the parts. Given this evidence that Appellant actively sought to discover whether the parts were stolen, and the limited scope for the willful blindness instruction, Appellant argues that it was an abuse of discretion to give such an instruction.

We hold that the district court did not abuse its discretion. First, this circuit has never adopted the Ninth Circuit's additional requirement that the government prove that the defendant's ignorance was for the purpose of providing a defense in case of prosecution. Second, while the deliberate blindness instruction is only proper in rare circumstances, this is just such a situation. There is ample evidence supporting the district court's decision to give the willful blindness instruction: Appellant prohibited his employees from contacting Pratt & Whitney about the parts; Byard's testimony was indirectly inconsistent with Appellant's assertion that he "grilled" Byard about the legitimacy of the parts; the parts came without the normal documentation associated with aircraft parts; Appellant did not keep invoices or receipts of the parts purchased from Byard; Byard only sold Appellant parts by driving them to Appellant's house -- typically other parts purchases came via UPS or Federal Express; Appellant set the price he would pay Byard for the parts; payment was made to Byard or one of his family members, not to Pratt & Whitney; Byard's reference in a phone conversation to difficulty in obtaining parts due to increased security; and the fact that many of the parts contained red Pratt & Whitney "to be scrapped" tags. Thus, it was not an abuse of discretion for the district court to find that the evidence supported the inference that Appellant was purposely remaining ignorant of Byard's illegal acts.

IV.

A district court's decision to grant or deny a motion under Federal Rule of Criminal Procedure 12(f) seeking to file an untimely motion

10

to suppress is reviewed for clear error. See United States v. Chavez, 902 F.2d 259, 262-65 (4th Cir. 1990); United States v. Wertz, 625 F.2d 1128, 1132 (4th Cir. 1980); United States v. Mangieri, 694 F.2d 1270, 1282 (D.C. Cir. 1982).

Appellant argues that government exhibits 12 through 44 (the "Vennekotter documents") were seized in violation of his Fourth Amendment rights and asserts that they were erroneously admitted into evidence. Exhibits 12 through 44 are photocopies of tags that were affixed to various aircraft parts in Ruhe's place of business. The FBI had contacted one of Appellant's employees, Roy Vennekotter, and asked him to make the photocopies. Vennekotter did as requested and gave the photocopies to the FBI. The FBI did not have a warrant for this search.

Although we have some doubts about the legality of the search, we need not reach that issue. Under Fed. R. Crim. P. 12(f), the general rule is that a defendant forfeits a suppression claim if that claim is not timely raised. Such a forfeiture can be excused if good cause is shown. Fed. R. Crim. P. 12(f). Whether or not the Vennekotter documents should have been suppressed, Appellant forfeited his right to challenge the search by failing to seek suppression of the Vennekotter documents, and failing to object to their admission at trial. Prior to trial, but after the deadline for filing a motion to suppress, the government gave Appellant its proposed exhibit list. This list stated that the government intended to introduce "Documents provided by Roy Vennekotter of the tags from the Ohio Turbine Center." (J.A. 151-152.) We hold that this list gave Appellant the requisite notice to challenge the Vennekotter documents via a motion to suppress. **6** His failure to timely do so forfeited his rights.

Appellant argues that there was good cause for his failure to file a pre-trial motion to suppress. According to Ruhe, the vague reference

_____

**6** The district court stated in its memorandum opinion and order that it would have allowed Appellant to file a motion to suppress out of time had such a motion been filed shortly after the exhibit list was made available. Under United States v. Chavez, 902 F.2d 259, 262-64 (4th Cir. 1990), the district court would have been required to allow such a pre-trial challenge.

11

to Vennekotter in the exhibit list was insufficient to give him notice of the potential illegality of the search. The exhibit list item, "Documents provided by Roy Vennekotter of the tags from the Ohio Turbine Center," only indicates the source of the Vennekotter documents and does not suggest that Vennekotter obtained the documents at the FBI's bidding. Therefore, the first time he says he learned that the documents had been obtained from Vennekotter at the FBI's direction -- the basis for a motion to suppress -- was at trial, when Vennekotter testified to that effect. After learning this information, Ruhe maintains he raised the suppression issue at the earliest opportunity -- in a post-trial motion for acquittal.

Ruhe's arguments are unavailing. Defendants are subject to a due diligence standard. Even if the defendant did not know all of the information establishing the basis for a claim, the court will not excuse a forfeiture if the defendant, by due diligence, could have or should have discovered the basis for the claim. See United States v. Mangieri, 694 F.2d at 1283-84; United States v. DeLuna, 616 F. Supp. 534, 538-539 (W.D. Mo. 1985). In United States v. Chavez, this Court held that good cause existed to excuse a failure to timely file a motion to suppress when the defendant did not know the basis for that motion until after the time for such a motion had expired. Chavez, 902 F.2d at 262-65. Chavez is distinguishable from the present one, however. In Chavez the information serving as the basis for the suppression claim was only available in a grand jury transcript. The court had prevented the defendant from inquiring into the substance of the information at a preliminary hearing. The day after the government finally turned over the grand jury transcript, and prior to trial, the defendant filed his by then untimely motion to suppress. We held that under the circumstances, the district court's refusal to entertain that motion was clear error.

In the case sub judice, as of the moment the exhibit list was filed, Appellant was on notice of the possibility that the government had used Vennekotter as its agent. Although the exhibit list was not one-hundred percent clear, the statement in the exhibit list was sufficient to alert Appellant that he needed to investigate further. To borrow from the court in Mangieri:

> Even if [the clues in the exhibit list] fell short of providing
> a detailed roadmap of . . . the precise facts that appellant

12

eventually relied on in his motion to suppress, they certainly should have pointed to a need to undertake some basic discovery as to whom the government was talking and how they [obtained the evidence to be used at trial].

Mangieri, 694 F.2d at 1284.

Additionally, after Vennekotter testified, Appellant had all the information he needed to object to the admission of the documents taken by Vennekotter. Appellant failed to challenge the admission of the Vennekotter documents at that time, however. If the district court had accepted Appellant's claim that he had good cause for the delay in seeking to have the Vennekotter documents suppressed, then the district court may have passed on that motion. See United States v. Cranson, 453 F.2d 123, 125 (4th Cir. 1971). Cf. Chavez, 902 F.2d at 262-64 (requiring district court to allow untimely motion for good cause before trial). Instead Appellant chose to wait until after trial to raise the suppression issue in a motion for acquittal. A motion at that late date, given the prior knowledge and opportunities to raise the motion, was untimely.**7**

_____

**7** Appellant also notes that we may hear his claim if the district court committed plain error in admitting the evidence. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 732-34 (1993) (noting difference between waiver and forfeiture in plain error analysis). We find no error here approaching the Olano standard. See Olano, 507 U.S. at 732-36 (holding that plain error requires (1) an"error," (2) that is "plain," i.e., clear or obvious, (3) that "affect[s] substantial rights," and (4) that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.") In particular, even if the Vennekotter documents should have been excluded, this error was not "plain": it is a close and complex question whether the FBI's use of Vennekotter violated Ruhe's Fourth Amendment rights. Compare Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 614 (1989) (when private person acts as government agent, his searches and seizures become subject to Fourth Amendment), Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971) (same), Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (a search by a government agent without a warrant is per se unreasonable unless it falls into one of the well-defined exceptions), and Marshall v. Barlow's, Inc., 436 U.S. 307, 315 (1978) ("The owner of a business has not, by the necessary utilization of employees . . . thrown open the areas where employees

13

V.

We reject Appellant's challenges to the district court's treatment of his polygraph evidence. Appellant argues that the district court committed two errors with regard to his effort to have polygraph evidence admitted.**8** First, Appellant asserts that the district court improperly refused admission of his polygraph evidence at trial and asks us to reconsider the Fourth Circuit's per se ban on such evidence. Second, Appellant challenges the district court's refusal to consider the polygraph evidence at sentencing as a basis for giving Appellant a 2-level decrease for Acceptance of Responsibility under U.S.S.G. § 3E1.1.

A.

We review a district court's evidentiary rulings for an abuse of discretion. United States v. ReBrook, 58 F.3d 961, 967 (4th Cir. 1995). The district court refused to admit polygraph evidence at trial, citing this circuit's per se ban on polygraph evidence. See United States v. Sanchez, 118 F.3d 192, 197 (4th Cir. 1997); United States v. Chambers, 985 F.2d 1263, 1270-71 (4th Cir. 1993); United States v. A & S Council Oil Co., 947 F.2d 1128, 1134 (4th Cir. 1991); United States v. Herrera, 832 F.2d 833, 835 (4th Cir. 1987); United States v. Tedder, 801 F.2d 1437, 1444-45 (4th Cir. 1986).

Appellant now asks this Court to reconsider the Fourth Circuit's per se ban. Ruhe has picked a particularly inopportune time to make this request because the Supreme Court has recently held that such per se bans on polygraph tests are permissible. See generally United States v. Scheffer, ___ U.S. ___, 118 S. Ct. 1261 (1998). In any event,

_____

alone are permitted to the warrantless scrutiny of government agents"), with id. at 314-15 ("What [employees] observe in their daily functions is undoubtedly beyond the employer's reasonable expectation of privacy."), and United States v. Jenkins, 46 F.3d 447, 455-456 (5th Cir. 1995) (finding employee-assisted search constitutional based on theory that employee could consent to the search).

**8** The polygraph evidence consisted of Appellant's answers to questions concerning his knowledge regarding the fact that the aircraft parts were stolen.

14

as a simple panel, we are bound by prior precedent from other panels in this circuit absent contrary law from an <u>en banc</u> or Supreme Court decision. <u>See Busby v. Crown Supply, Inc.</u>, 896 F.2d 833, 840-41 (4th Cir. 1990) (<u>en banc</u> section of the opinion). **9**

B.

We review a district court's decision to grant or deny an adjustment for acceptance of responsibility for clear error. <u>United States v. Castner</u>, 50 F.3d 1267, 1279 (4th Cir. 1995).

Appellant contends that it was clear error for the district court to refuse to consider his polygraph evidence at sentencing. Appellant contends that the polygraph evidence clearly entitles him to a downward departure for acceptance of responsibility.

Regardless of whether the district court should have considered the polygraph evidence at sentencing, it was not clearly erroneous for the district court to refuse to use that evidence to grant a two-level decrease for Acceptance of Responsibility. As the district court noted in its Memorandum Opinion and Order, Appellant's polygraph evidence did not at all show that he accepted responsibility for his crime. In fact, the polygraph evidence at issue only indicated Appellant's continued <u>denial</u> of responsibility because it only served as evidence that he did not realize that the aircraft parts were stolen -- i.e., that he did not commit the crime for which he was charged. Therefore, the district court did not commit any error in denying to grant Appellant a decrease for Acceptance of Responsibility based on the polygraph evidence.

VI.

Ruhe challenged the jury's verdict with a motion for judgment of acquittal, <u>see</u> Fed. R. Crim. P. 29, claiming the government presented

_____

**9** In <u>United States v. Toth</u>, 91 F.3d 136, 1996 WL 426865 (4th Cir. 1996) (unpublished table disposition), it was suggested that a panel could rely upon <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), to alter the circuit's law on polygraph evidence. Ruhe has not advanced that argument and we do not pass upon it.

insufficient evidence to convict him. When assessing the sufficiency of the evidence of a criminal conviction on direct review, "[t]he verdict of [the] jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). That is, we must examine whether a rational fact finder could fairly find the essential elements of the crimes charged beyond a reasonable doubt. See United States v. Burgos, 94 F.3d 849, 863 (4th Cir. 1996) (en banc); United States v. Kennedy, 32 F.3d 876, 886 (4th Cir. 1991). The court must "give[ ] full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Appellant argues that the government failed to produce evidence sufficient to prove beyond a reasonable doubt that each element of the offense had been satisfied.**10** In particular, Appellant argues (1) that there was insufficient evidence that he knew the purpose of the agreement and then deliberately joined the conspiracy agreement or understanding, and (2) that there was insufficient evidence that he knew the aircraft parts were stolen.

We affirm the district court's rejection of this motion. The government presented substantial evidence upon which a reasonable jury could have found that Appellant either knew that the parts were stolen or was deliberately blind to that fact. Further, there was substantial evidence that Appellant deliberately continued to take part in the ongoing criminal enterprise to obtain the stolen goods. Such evidence includes the facts that the red-tagged nature of the parts alerted even unknowledgeable employees that the parts were from a questionable source; that Appellant paid Byard directly rather than Pratt & Whitney; that he dictated the price to be paid; that he refused to allow employees to contact Pratt & Whitney; and that Byard had indicated that he would have difficulty obtaining parts in the future due to increased security.

_____

**10** Ruhe's challenge to the jurisdictional element of the crime is discussed infra in section VII.

16

VII.

Finally, Appellant contends that the district court incorrectly calculated the amount of the loss for jurisdictional and sentencing purposes. The federal courts only have subject matter jurisdiction when the value of the stolen goods is $5,000 or more. 18 U.S.C.A. § 2314. Additionally, the length of a defendant's sentence under the Sentencing Guidelines § 2B1.1 is contingent upon the value of the loss. According to Appellant, because of the incorrect valuation of the loss the district court erroneously increased his sentence by eight levels.

A.

Since the jurisdictional value of the goods is an element of the crime, United States v. Wentz, 800 F.2d 1325, 1326 (4th Cir. 1986), we review the record to see if there was substantial evidence such that a rational juror could find beyond a reasonable doubt that the jurisdictional value had been satisfied. See Burgos, 94 F.3d at 863; Kennedy, 32 F.3d at 886.

The district court held that the jury could have concluded that the jurisdictional value had been satisfied if they valued the stolen aircraft at the fair market value of that property as evidenced by the amount that Appellant actually paid for that property.

Appellant argues that the most the jury could have concluded the parts were worth was $170. Ruhe notes that most of the property stolen was "red-tagged," meaning destined for scrap and mutilation. He points to evidence at trial that Pratt & Whitney sells mutilated scrapped parts at 85 cents per pound, which would put the total value of the 200 pounds of goods received at between $85 and $170. Appellant points to United States v. Clutterbuck, 421 F.2d 485 (9th Cir. 1970), to support his position. Clutterbuck has facts very similar to those at bar. In Clutterbuck, the defendant was charged with stealing aircraft parts which had been used and discarded as outworn and then held out for sale as steel scrap. The defendant argued that the jurisdictional amount had not been satisfied because the parts had to be valued as steel scrap rather than as classified, segregated parts. The Ninth Circuit agreed:

17

We hold that where as here machine parts have been used by the government to the point where their usefulness to the government as such has been exhausted; and where they have been discarded and held for disposal as scrap rather than as classified, segregated parts, they have lost their original identity and have been transformed into scrap. . . . The fact that a discriminating thief pawing over a scrap bin can identify some of the scrap items as [particular aircraft parts] and confine his theft to them does not change the result. Neither the thief's purpose, nor potential retransformation or use alters the fact that the thing of value stolen from the government constituted steel scrap.

Clutterbuck, 421 F.2d at 486. Appellant also notes that in United States v. Carawan, 64 F.3d 660, 1995 WL 478014 (unpublished table disposition) (4th Cir. 1995), the panel used language indicating an agreement with the Clutterbuck decision.

We affirm the district court's determination that the jury could have concluded beyond a reasonable doubt that the property for jurisdictional purposes had a value of $86,100, the value paid by Appellant. For violations of § 2314, the value of stolen property is defined, as the "face, par, or market value, whichever is greatest." 18 U.S.C.A. § 2311 (West 1970) (emphasis added). The standard test for market value is the price a willing buyer would pay a willing seller at the time and place the property was stolen. Wentz , 800 F.2d at 1326; United States v. Cummings, 798 F.2d 413, 415 (10th Cir. 1986). Even though the parts were destined for sale as scrap, they also had an independent resale value in the overhaul market as evidenced by Appellant's purchases.

While Clutterbuck's facts are closely analogous, it really deals with a different legal issue -- whether a cost price (i.e., original cost) could be used as the valuation method. See Clutterbuck, 421 F.2d at 486. The government has not sought to have cost pricing used to determine value, only the amounts paid by Appellant. Clutterbuck is further distinguishable because there the parts at issue were to be sold exactly as is for scrap. By contrast, in the case at bar, the parts would be mutilated before being sold as scrap. In their condition when sold, Appellant, a willing buyer paid over $5,000 for the goods to a willing

18

seller.**11** <u>Cf. United States v. Robie</u>, 166 F.3d 444, 449-52 (2d Cir. 1999) (holding that jury could infer that stolen, misprinted stamps that were worthless to the Postal Service nevertheless had a jurisdictional value of more than $5,000 because the defendant was aware that the stamps could be sold for a price greater than the jurisdictional amount). Therefore, for jurisdictional purposes there was substantial evidence such that the jury could find that the jurisdictional value had been satisfied.

B.

Appellant also challenges the determination of the value of the goods for sentencing purposes. Determining the value of stolen property for sentencing purposes is a factual issue reviewed for clear error when the facts are disputed, but a question of law reviewed <u>de novo</u> when the facts are undisputed. <u>See United States v. Chatterji</u>, 46 F.3d 1336, 1340 (4th Cir. 1995). Here the facts are undisputed, so review is <u>de novo</u>. Under the Sentencing Guidelines, a court need not determine the value of stolen goods with precision, but need only make a reasonable estimate of the value given available information. U.S.S.G. § 2B1.1, comment (n.3).

The district court applied the same valuation approach for sentencing purposes that it had presumed the jury had used for jurisdictional purposes. We find this approach to be erroneous and therefore vacate Appellant's sentence and remand for re-sentencing.

There is no statutory reason why the value of certain goods for jurisdictional purposes should be the same as the value for sentencing purposes. In fact, there are good reasons why these values should be different. <u>See</u>, <u>e.g.</u>, <u>Robie</u>, 166 F.3d at 455 (holding that district court erred in sentencing defendant based on the value of stolen goods to the defendant when the goods were valueless to the victim, even

_____

**11** Appellant argues that Byard was not a "willing seller" because he stole the property and Pratt & Whitney, the rightful owner, would not have sold these parts. Testimony at trial showed, however, that Byard's status as a thief meant simply that he accepted less for the goods than would have a willing seller who had purchased the goods through legitimate channels.

19

though the court had previously determined that a finding of the jurisdictional amount could be based on the value of the goods to the defendant). First and foremost, the definitions are different. For jurisdictional purposes, 18 U.S.C.A. § 2311 requires a determination of the "value" of the goods. As noted above, value is defined as "face, par, or market value." By contrast, the Sentencing Guidelines are concerned with the "loss" to the victim. U.S.S.G.§ 2B1.1(b)(1). See also Frank O. Bowman, III, Coping with "Loss": A Re-examination of Sentencing Federal Economic Crimes Under the Guidelines , 51 Vand. L. Rev. 461, 463 (1998) (stating that the basic proposition accepted by the Sentencing Commission is that the focus of sentences should be on the magnitude and nature of the economic deprivation caused by the crime). Cf. Husten v. United States, 95 F.2d 168, 170 (8th Cir. 1938) (noting that valuation for purposes of 18 U.S.C. § 2314 is not concerned with loss to the victim). The general rule is that loss is determined by measuring the harm to the victim. See U.S.S.G. § 2B1.1, comment (n.2).

Admittedly, the application notes to the Sentencing Guidelines define "loss" as the "value" of the property taken, ordinarily the "fair market value." U.S.S.G. § 2B1.1, comment (n.2). In the Guidelines context, however, "value" and "fair market value" are merely methods for determining the loss to the victim. See, e.g., United States v. Parsons, 109 F.3d 1002, 1003 (4th Cir. 1997); Chatterji, 46 F.3d at 1340;[12] United States v. Haddock, 12 F.3d 950, 960 (10th Cir. 1993).

A second important difference is that, for jurisdictional purposes, the statute directs the court to use whichever value is the greatest. 18 U.S.C.A. § 2311. The Sentencing Guidelines contain no such command. The Sentencing Guidelines are not mean-spirited, seeking to keep a defendant behind bars for as much time as conceivably possible; they are concerned with the severity of the harm caused by the defendant. See Bowman, supra. Thus, rather than choosing the greatest value offered by different methodologies, the Guidelines instruct the courts to find the value that most closely represents the loss to the victim. See, e.g., Chatterji, 46 F.3d at 1340 ("[G]ain is only an alter-

_____

**12** Both Parsons and Chatterji involved the word "loss" as used in U.S.S.G. § 2F1.1. Application Note 7 of that section states that "loss" for purposes of § 2F1.1 is the same as "loss" for purposes of § 2B1.1.

native measure of some actual, probable, or intended loss; it is not a proxy for loss when there is none."); <u>United States v. Robie</u>, 166 F.3d 444, 455 (2d Cir. 1999) (rejecting use of defendant's gain when no economic loss to the victim); <u>United States v. Andersen</u>, 45 F.3d 217, 221-22 (7th Cir. 1995) (where there is no evidence of financial loss to the victim, sentencing enhancement based on defendant's gain is not appropriate).

The district court relied on <u>United States v. Barnes</u>, 116 F.3d 473, 1997 WL 337454 (4th Cir. 1997) (unpublished table disposition), to support its decision. In <u>Barnes</u>, the defendants stole computer memory modules from their employer and sold them for large sums of money. The defendants maintained that at least some of these modules had been rejected and would have been thrown away, but the defendants were able to repair them. The district court found that the majority of the modules were in good condition when stolen. The panel rejected the argument on appeal that the "loss" was zero because the faulty chips would only have been discarded. The panel instead held that the "loss" for sentencing purposes was the value which the defendants received upon resale of the chips:

> Even if all the stolen materials were genuine rejects which Mitsubishi would not have marketed, they still had a market value. Whether Mitsubishi intended to sell them or recycle them is not determinative. Mitsubishi suffered a loss by having its products stolen and the sale of these products established their fair market value.

<u>Barnes</u>, 116 F.3d at 473.

We are not controlled here by <u>Barnes</u>. First, unpublished opinions are not binding precedent in this circuit. <u>See Hogan v. Carter</u>, 85 F.3d 1113, 1118 (4th Cir. 1996) (Motz, J., concurring in the judgment); 4th Cir. R. 36(c). Second, the above-quoted passage is dicta. The facts in <u>Barnes</u> showed that many of the modules stolen were not defective and would have been sold by the victim absent the theft. Finally, to the extent that <u>Barnes</u> is inconsistent with <u>Chatterji</u>'s remonstration that the defendant's gain is not a proxy for loss when there is none, <u>see Chatterji</u>, 46 F.3d at 1340, we are controlled by the published decision. <u>See also Robie</u>, 166 F.3d at 455.

21

Therefore, we remand for re-sentencing with instructions that the district court consider the loss to the victim, here Pratt & Whitney, for sentencing purposes. Of importance to decide the issue may be the extent to which, in each case, the instruction to mutilate by Pratt & Whitney had been accomplished when the part was stolen. We note that for those parts which Pratt & Whitney would only have sold for scrap, the scrap value seems to be the most accurate method of valuing loss. Indeed, in the presentence report, counsel for Pratt & Whitney stated that the company suffered no loss. The district court will have to sort through the facts on re-sentencing.

AFFIRMED IN PART AND VACATED AND
REMANDED IN PART WITH INSTRUCTIONS

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I through VI and VII.A. I respectfully dissent from Part VII.B.

My disagreement is with the majority's interpretation of U.S.S.G. § 2B1.1 where it measures the "loss" for sentencing purposes by the value of goods to the victim. While the majority states categorically that § 2B1.1 is "concerned with the `loss' to the victim," supra at 20 (emphasis added), the Sentencing Guideline and the Application Note to it permit no such interpretation, and for good reason. By misinterpreting the Guideline, the majority's opinion improperly reduces the sentence required for the offense for which the defendant was convicted.

Ruhe was convicted of dealing in stolen property having a value greater than $5,000 in interstate commerce. See 18 U.S.C. § 2314. The applicable Sentencing Guideline for that offense reads in part, "If the loss exceeds $100, increase the offense level as follows: [a chart of loss values and corresponding sentencing enhancements then follows]." U.S.S.G. § 2B1.1(b)(1) (emphasis added). The Application Note defines "loss" to mean "the value of the property taken." It goes on to say: "Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as

22

reasonable replacement cost to the victim." U.S.S.G. § 2B1.1, comment. (n.2) (emphasis added). This comment makes it clear that the general rule for valuing loss requires the court to determine the market value of the stolen property. Only where market value is difficult to ascertain or where the market value underterminated the harm to the victim is a court permitted to use an alternative valuation method. A court is not permitted to ignore the mandated fair market valuation method simply to avoid being "mean-spirited" toward the criminals who trafficked in stolen property. See supra at 20. Where dealers buy and sell stolen property, there can be no difficulty determining the market value of the property, and there generally would be no claim that the market value understates the harm to victims of the defendants' trafficking offense, such as the purchasers of the stolen goods or their competitors. While theft has one victim, the dealing in stolen property has others. But regardless of the value of stolen goods "to the victim," when they have value in the marketplace, as established by multiple transactions among dealers engaging in stolen property, the Guideline necessarily intends that the sentencing be measured by that "fair market value."

The majority's reliance on United States v. Chatterji, 46 F.3d 1336 (4th Cir. 1995), is misplaced as Chatterji did not deal with any theft of or dealing in stolen goods. Rather, in Chatterji, the defendant's fraud consisted of conducting a drug test improperly in an effort to obtain quick FDA approval of one drug and misleading the FDA as to a formula change of another drug product. See id. at 1338-39. Although there was fraud, nothing was taken, and thus there was no "loss" under the Sentencing Guidelines. Even if one were to contend that FDA approval was "stolen," FDA approval cannot be bought or sold, even by the FDA, and thus has no market value. In contrast, the defendant was convicted of trafficking in stolen airplane parts. Something was stolen, sold, and resold, providing a readily ascertainable value. This case, while not at all like Chatterji, is much more like United States v. Barnes, 116 F.3d 473, 1997 WL 337454 (4th Cir. 1997) (unpublished), where we held that the proper valuation of the goods stolen by the defendants was the amount of money that they had received for the goods (i.e. the market value) even though it appeared that the goods had been worth less to the goods' true owner.

I would further note that the absence of any suggestion in the Guidelines and Application Notes that loss valuation is to be limited

23

could only be a deliberate decision by the Sentencing Commission. The crime in the case before us was indeed not even a theft crime but a crime for dealing in interstate commerce in stolen goods. See 18 U.S.C. § 2314. While the victim of the original theft was Pratt & Whitney, the parties to the transactions which were made criminal by § 2314 were Ruhe and Byard, and their victims were subsequent purchasers and customers, as well as competitors in the market. The essence of this crime is dealing, not stealing. Accordingly, it makes yet less sense for the majority to read into the Guideline a limitation that focuses only on the subjective financial valuation of Pratt & Whitney. Moreover, while Pratt & Whitney was the victim of the original theft, it was not the victim of a market that deals in stolen goods. Accordingly, "loss" as defined in U.S.S.G. § 2B1.1 does not, and cannot be, limited to "loss to the victim."

Because the parties to the illegal transactions in this case dealt in stolen goods worth more than $70,000 as evidenced by the money they exchanged, thereby establishing a floor for the goods' market value, the "loss" as used in U.S.S.G. § 2B1.1 and defined by the Application Note is over $70,000. See U.S.S.G. § 2B1.1, comment. (n.2) (defining loss as fair market value).

I would affirm the district court's sentence.