PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

v.

DAVID ARMSTEAD,
　　　　　　*Defendant-Appellant.*

No. 05-5157

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonard D. Wexler, Senior District Judge,
sitting by designation.
(CR-05-13)

Argued: February 1, 2008

Decided: May 6, 2008

Before NIEMEYER, TRAXLER, and DUNCAN, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Traxler and Judge Duncan joined.

---

## COUNSEL

**ARGUED:** Dale Edwin Sanders, Alexandria, Virginia, for Appellant. Jay V. Prabhu, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Chuck Rosenberg, United States Attorney, Charles F. Connolly, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

**OPINION**

NIEMEYER, Circuit Judge:

After selling 100 "bootleg" DVDs of unreleased movies to an undercover federal agent on June 11, 2003, and then selling 200 more to the same agent on January 13, 2004, David Armstead was indicted and convicted on two felony counts of willful copyright infringement for private financial gain by distributing at least 10 unauthorized DVDs on each occasion, having "a total retail value of more than $2,500," in violation of 17 U.S.C. § 506(a)(1) and 18 U.S.C. § 2319(b)(1). At trial, Armstead contested only the total retail value of the DVDs sold and urged that he be convicted of only misdemeanors for selling DVDs with a total retail value of $2,500 or less. *See* 18 U.S.C. § 2319(b)(3). The jury, however, convicted Armstead of the felony charges, and he was sentenced to six months' home detention.

On appeal, Armstead focuses on the fact that he sold the DVDs in the first transaction for a total of $500 and in the second transaction for a total of $1,000, and that the government offered no adequate alternative value to prove that the "total retail value" of the DVDs sold in each transaction was more than $2,500, as required for felony convictions. He requests that we vacate the felony convictions and enter judgments for misdemeanor offenses, remanding the case for resentencing accordingly.

As a matter of first impression, we hold that "retail value" as used in 18 U.S.C. § 2319(b)(1) refers to the value of copies of the copyrighted material at the time the defendant committed the violation and sold the copies and that the retail value is determined by taking the highest of the "face value," "par value," or "market value" of copies of the copyrighted material in a retail context. *See* 18 U.S.C. § 2311. Because the evidence of retail value, so construed, supported felony convictions, we affirm.

I

On June 11, 2003, Armstead sold 100 illicit movies in DVD format for $500 ($5 per DVD) to an undercover agent of the Bureau of

Immigration and Customs Enforcement ("ICE") at the parking lot of the Springfield Mall in northern Virginia. The 100 bootleg DVDs included 25 copies of "2 Fast 2 Furious"; 25 copies of "The Matrix Reloaded"; 25 copies of "Finding Nemo"; 15 copies of "The Italian Job"; and 10 copies of "Wrong Turn." Again on January 13, 2004, Armstead sold the same agent more illicit movies in DVD format, this time 200 DVDs for $1,000 (again $5 per DVD). The 200 bootleg DVDs included 75 copies of "Lord of the Rings: The Return of the King"; 75 copies of "Paycheck"; 25 copies of "Bad Santa"; 15 copies of "My Baby's Daddy"; and 10 copies of "Gang of Roses." The copies sold on both occasions were, for the most part, made by using a hand-held camcorder to record the films as they played in movie theaters and were, with a few exceptions, of poor quality. At the time, however, better copies of the DVD movies sold to the undercover agent were not available, as the movies were only in the "theatrical release" stage and authorized DVDs were not yet available. According to the undercover agent, legitimate DVDs would not be available until three to six months after the movie was released to theaters.

Armstead was indicted in two felony counts, one for each occasion on which he sold DVDs to the undercover agent.

At trial, Armstead conceded all elements of the offenses against him except the "total retail value" of the DVDs, claiming that their total value on each date was far less than $2,500, the threshold amount for felony liability under 18 U.S.C. § 2319(b)(1). He contended that with the proper finding of retail value, he could be convicted of only misdemeanors. He grounded his retail value assertions on the fact that the only hard evidence of retail value was the price of the DVDs in the "thieves' market," which priced the DVDs at $500 on the first occasion and $1,000 on the second.

Although the jury was instructed that if it found every element of the crime other than a retail value of over $2,500, it could return only misdemeanor convictions, it returned felony convictions on both counts. The district court sentenced Armstead to six months' home detention, five years' probation, and ordered him to pay $1,500 in restitution.

On appeal, Armstead presents the single issue of retail value and argues that "retail value," as used in § 2319(b)(1), refers to "the price

a willing buyer would pay a willing seller at the time and in the market in which [the infringing DVDs are] sold — the thieves' market." With that definition of "retail value," Armstead contends that the evidence at trial was insufficient to support felony convictions.

## II

The Copyright Act, in relevant part, provides that "[a]ny person who willfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed — (A) for purposes of commercial advantage or private financial gain." 17 U.S.C. § 506(a)(1)(A). Section 2319 of Title 18, in turn, provides in relevant part:

> Any person who commits an offense under section 506(a)(1)(A) of title 17 —
>
> (1)   shall be imprisoned not more than 5 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution, including by electronic means, during any 180-day period, of at least 10 copies or phonorecords, of 1 or more copyrighted works, *which have a total retail value of more than $2,500*.

18 U.S.C. § 2319(b)(1) (emphasis added). Section 2319 also provides that if the $2,500-retail-value element is not satisfied, the defendant is to be punished for a misdemeanor. *See id.* § 2319(b)(3).

Armstead's argument that the government failed to produce sufficient evidence that the DVDs he sold to the undercover agent had an aggregate retail value of more than $2,500 hinges on the meaning of "retail value" as used in § 2319(b)(1). He asserts that retail value, as used in the statute, means "the price a willing buyer would pay a willing seller at the time and in the market in which it is sold — the thieves' market." With this definition of "retail value," he argues that what a willing buyer would pay a willing seller at the time was evidenced by what the undercover agent paid him and therefore that the retail value amount was insufficient to satisfy the felony threshold amount of $2,500.

The government contends that "retail value" refers to the higher value of what a willing buyer would pay a willing seller for a *legitimate* copy of the infringed item, such as an authentic, authorized DVD of the same movie. The government states that retail value as used in the statute is not the "'bootleg value' the defendant received on the black market." It argues, "[i]f the Congress had meant to use the 'bootleg value' or 'wholesale value' of counterfeit product[s], it certainly would have used that or similar language; instead, the Congress used the phrase 'total retail value' of the copyright works."

Both parties seem to be arguing about a "market value," debating whether the relevant "market" from which to draw this market value refers to the market for bootleg products or the market for legitimate products. But their debate fails to account for the statutory language, which produces a broader formulation of "retail value."

"Retail value," as a phrase, is not defined in the statute, but "value" is. Section 2311, which provides definitions for chapter 113 of Title 18 (addressing "Stolen Property") defines "value" for the entire chapter (in which § 2319 is included) as "the face, par, or market value, *whichever is the greatest*." 18 U.S.C. § 2311 (emphasis added). Thus, "value" is measured not only by actual transactions that define a market, but also by face or par values assigned to commodities or goods before reaching the market, and the statute instructs that the greatest of those "values" be used. "Retail," which is not defined at all, refers, in its ordinary meaning, to sales transactions of commodities or goods in small quantities to ultimate consumers. *See, e.g.*, Webster's Third New International Dictionary 1938 (1993). As distinct from "retail," "wholesale" refers to sales transactions of goods and commodities in quantity for resale. *Id.* at 2611. It follows, accordingly, that retail prices are higher than wholesale prices.

Thus considering "retail" and "value" as component terms that are individually defined by common understanding and by § 2311, respectively, we conclude that "retail value" refers to the greatest of any face value, par value, or market value of commodities or goods in reference to actual or potential sales to ultimate consumers. Thus, while market value — a value determined by the price that a willing buyer would pay a willing seller — is included in the class of values defined as "retail value," it is not the exclusive determinant. It follows

that if a manufacturer of DVDs sells its DVDs at wholesale with a suggested retail price of $29 and the retailer actually sells the DVDs to the consumer at the discounted price of $19, the "retail value" as used in § 2319(b)(1) refers to the greater of the two numbers, or $29 per DVD. Of course, if the prices paid in actual retail transactions were the *only* evidence presented to support a prosecution under § 2319(b)(1), those prices could be considered as evidence of an actual "market value," which would be a permissible value for consideration as the "retail value."

In this case, while the parties agree that a "market value" may be determined by the price that a willing buyer would pay a willing seller, *see United States v. Ruhe*, 191 F.3d 376, 390 (4th Cir. 1999) (defining a "market value" as "the price a willing buyer would pay a willing seller at the time and place the property was stolen"), they disagree on whether that market value may be determined by sales in a "thieves' market." The government provides no authority to support the position that prices paid in a "thieves' market" cannot be a market value. Indeed, its only definition — the price of a movie "if it were sold to a member of the public" — would seem to include any market, except for the fact that the government argues for a value determined only by a market of "legitimate" copies. The government's assertion that the market for illicit goods is not determinative of "retail value" may be correct, but only if there is other evidence of a higher "value." *See* 18 U.S.C. § 2311. Otherwise, a black market for illegitimate goods undoubtedly may provide evidence of a "market value." *See United States v. Oberhardt*, 887 F.2d 790, 792-93 (7th Cir. 1989) (applying the "thieves' market" price when it was higher than the legitimate price of the item to be valued under 18 U.S.C. § 641, which instructed the court to use "face, par, or market value, or cost price, either wholesale or retail, whichever is greater"); *cf. United States v. Bakken*, 734 F.2d 1273, 1278-79 (7th Cir. 1984) (holding that the "market value" component of 18 U.S.C. § 2311 included the "thieves market" price a willing buyer would pay a willing seller for the illicit goods); *United States v. Berkwitt*, 619 F.2d 649, 658 (7th Cir. 1980) (same). And § 2311 directs that the criterion for satisfying the threshold amount for a felony conviction be the "greatest" of the permissible values in evidence. *See also Ruhe*, 191 F.3d at 390.

It remains undisputed by the parties that whatever value is used, it must be a value applicable at the time the violations occurred and the

transactions in question took place — in this case, June 2003 and January 2004.

Accordingly, retail value, as used in § 2319(b)(1), refers to prices assigned to commodities and goods for sale at the retail level at the time of sales at issue, representing face value or par value, *or* prices of commodities and goods determined by actual transactions between willing buyers and willing sellers at the retail level — *whichever is the greatest*. This understanding of "retail value," which is derived from §§ 2311 and 2319, is confirmed by the House Committee Report that accompanied enactment of § 2319. That Report provided:

> The term "retail value" is deliberately undefined, since in most cases it will represent the price at which the work is sold through normal retail channels. At the same time, *the Committee recognizes that copyrighted works are frequently infringed before a retail value has been established*, and that in some cases, copyrighted works are not marketed through normal retail channels. Examples include motion pictures prints distributed only for theatrical release, and beta-test versions of computer programs. *In such cases, the courts may look to the suggested retail price, the wholesale price, the replacement cost of the item, or financial injury caused to the copyright owner*.

H.R. Rep. No. 102-997, at 6-7 (1992), *as reprinted in* 1992 U.S.C.C.A.N. 3569, 3574-75 (emphasis added) (footnote omitted); *see also* 138 Cong. Rec. 34,370-72 (1992) (statement of Sen. Hatch), *available at* 1992 WL 279577.

### III

In this case, Armstead sold the illicit DVDs to an undercover agent when the movies recorded on them had only been distributed for theatrical release (and perhaps for hotel and airline release) but certainly before they had been released on DVDs to the public. Thus, at the time of the illicit transactions, there was no legitimate retail market for the sale of DVDs except as evidenced by the occasional and sporadic illicit transactions of the kind represented in this case. As noted, prices paid in those illicit transactions might be evidence of a market

value. But in this case, the "thieves' market" prices were not the only evidence. The government presented evidence of other kinds of value that related to retail value during the theatrical release stage of the movies when the illegal transactions occurred.

First, the government offered the testimony of two different witnesses who indicated that, based on information from the Motion Picture Association of America, a single copy of a motion picture sold during the prerelease stage to hotels and airlines carries a price of at least $1,000 per copy, and, depending on the movie, up to $50,000 per copy. As one ICE agent explained, this was so because "at the time that these films are released in theaters, there is no legitimate market for [the public] to get [DVDs]. And the only people who can get a licensed copy of this film while it's in theaters is a hotel chain or an airline." The witness explained further that $1,000 was the price for the low-end films, and the more popular films could cost anywhere from $25,000 to $50,000 a copy. A piracy investigator for the Motion Picture Association of America then gave his opinion that there was "a good argument" to be made that the actual bootleg copies sold by Armstead "had a retail value of $1,000 a copy[,] as much as $50,000 [a] copy," even though he acknowledged that the number might be reduced somewhat to accommodate deficiencies in quality.

The government also presented testimony that *after a movie was released to the public through DVDs* — when prices for DVDs are much lower than prerelease values — the average retail price of the 10 DVD movies involved in this case would be "in every instance . . . higher than $19" per DVD.

Finally, the government proffered evidence that the "suggested retail price" of each of the DVDs sold by Armstead was between $25 and $30 per copy, but the district court excluded that evidence precisely because it was only suggested, and not actual. This was error, however, because the suggested retail price was relevant to determine a "face value" or "par value" that would be especially relevant to determining prerelease retail value. Indeed, the House Report that accompanied the bill for § 2319 explicitly noted that for unreleased movies, courts could look at suggested retail prices. H.R. Rep. No. 102-997, at 6-7. And since there would be evidence of both face value (had the court properly allowed it) and market value, the higher would

be applicable in determining the threshold amount for a felony conviction under § 2319(b)(1).

Based on our reading of the statute, the government's evidence of the prerelease values of copies of movies, the actual selling prices of legitimate copies of movies in the postrelease period, as well as the suggested retail prices (which were erroneously excluded by the trial court), were all appropriate evidence for a jury to consider in determining total retail value of the illicit transactions. Likewise, the evidence relied on by Armstead of the actual transaction prices in the wholesale "thieves' market" was appropriate evidence for a jury to consider. But in considering whether the evidence supports a conviction, we of course take the evidence actually presented to the jury and consider it in a view "most favorable to the Government." *See United States v. Kelly*, 510 F.3d 433, 440 (4th Cir. 2007).

While the government's evidence about the wholesale cost of a single copy of a movie sold to hotels before DVDs were released to the public was not directly on point, it was a benchmark from which the jury could rationally have concluded that DVDs sold during that period had a retail value that exceeded $25 per copy. The minimum $1,000 per copy for a movie sold to hotels was a wholesale price that included payment for a license to show the movie to hotel customers. But the jury could conclude that, if there were a market for the retail sale of such DVDs, it would be higher than the wholesale price. And even though hotels did not resell the copies they bought, they nonetheless recovered their costs and profits from multiple retail rentals in hotel rooms. In this manner, the jury could readily reason from the $1,000 threshold level to conclude that the retail value of a single DVD *before general release of the movie as a DVD* exceeded $25. This conclusion would be buttressed by the fact that the average postrelease price of DVDs in the legitimate market would be greater than $19 per copy, indicating a much greater price for such DVDs prerelease.

(Moreover, while the jury did not hear the evidence of the suggested retail prices, had the court admitted that evidence, as it should have, the "retail value" of a DVD would again be shown to exceed $25 per copy and therefore the threshold amount for a felony conviction.)

The fact that Armstead actually sold his DVDs in bulk for $5 per copy was also evidence that the jury could have considered. But this evidence would not be evidence of the *greatest* value; rather, it provided evidence of the lowest value that could be assigned to the DVDs. Indeed, the $5-per-copy price was a wholesale price, suggesting a "retail" value somewhat greater than $5 per copy.

Armstead makes much of the fact that the DVDs he sold were of poor quality, since most of them were recorded with camcorders in theaters. While he may be correct that the quality of the infringing copy might bear on retail value, this was something that he was able to, and did, argue to the jury, and the jury was fully able to take that into account in determining the retail value of the DVDs. But it could have recognized, for example, that at this prerelease stage, advance knowledge of the plot of a movie, the action, and how the movie ends might be far more significant to retail value than reproduction quality.

At bottom, the jury had sufficient evidence from which to conclude that each copy of the DVDs sold by Armstead to undercover agents during the period before the films' release to the public on authorized DVDs had a retail value exceeding $25 per copy and therefore that each transaction exceeded the threshold amount for a felony conviction. Moreover, with respect to the second transaction, which involved the sale of 200 DVDs, even the $19 per copy ($3,800 in total), testified to by government witnesses as a retail value for the postrelease market, exceeded the $2,500 threshold amount.

The judgment of the district court is

*AFFIRMED.*