**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 14-4204**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KAMAL ZAKI QAZAH, a/k/a Keemo,

Defendant - Appellant.

---

**No. 14-4366**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

NASSER KAMAL ALQUZA,

Defendant - Appellant.

---

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, Chief District Judge. (3:11-cr-00373-FDW-DSC-3; 3:11-cr-00373-FDW-DSC-10)

---

Argued: September 16, 2015       Decided: November 17, 2015

---

Before WILKINSON, NIEMEYER, and DUNCAN, Circuit Judges.

Affirmed in part, vacated in part, and remanded for resentencing by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge Duncan joined.

---

**ARGUED**: Milton Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE & FIALKO, Chapel Hill, North Carolina, for Appellants. Michael E. Savage, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF**: Christopher W. Adams, CHRISTOPHER W. ADAMS LAW OFFICE, Charleston, South Carolina, for Appellant Nasser Kamal Alquza. Jill Westmoreland Rose, Acting United States Attorney, Asheville, North Carolina, Anthony J. Enright, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

NIEMEYER, Circuit Judge:

A jury convicted Kamal Zaki Qazah and his uncle Nasser Kamal Alquza of conspiracy, in violation of 18 U.S.C. § 371, by conspiring to receive and transport stolen cigarettes in interstate commerce, in violation of 18 U.S.C. §§ 2314 and 2315; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. § 1956(a)(3). In addition, Qazah was convicted of receiving cigarettes purportedly stolen in interstate commerce, in violation of 18 U.S.C. §§ 2315 and 21. The district court sentenced Qazah to 216 months' imprisonment and Alquza to 108 months' imprisonment.

On appeal, Alquza challenges the district court's denial of his motion to suppress evidence recovered from a search of his house, as well as several other evidentiary rulings made at trial. Qazah challenges the court's denial of his motion to sever his trial from Alquza's. And both defendants challenge their sentences, primarily on the ground that the district court erroneously calculated the "loss" for which they are responsible under the Sentencing Guidelines by relying on the retail value of the purportedly stolen cigarettes, rather than their wholesale value. For the reasons that follow, we affirm the defendants' convictions, vacate their sentences, and remand for resentencing.

3

During 2010 and 2011, Qazah, in conspiracy with others, purchased thousands of cases of purportedly stolen Marlboro brand cigarettes from undercover law enforcement officers, who had represented that the cigarettes had been stolen from Philip Morris USA trucks in Virginia or Tennessee before being brought to North Carolina or South Carolina for sale. Each case of cigarettes contained 60 cartons, with each carton containing 10 packs. Qazah sold the purportedly stolen cigarettes, on which state taxes had not been paid, to coconspirators who operated convenience stores in South Carolina, allowing Qazah to make a substantial profit in the process.

Qazah eventually brought his uncle, Alquza, into the conspiracy in order to make additional money by laundering the undercover officers' cash proceeds from the cigarette sales. The two men provided the officers with checks drawn on various accounts in exchange for approximately $275,000 in cash.

In November 2011, the undercover officers arranged with Qazah the final controlled purchase of purportedly stolen cigarettes, agreeing to deliver 1,377 cases of cigarettes to a warehouse owned by Alquza on November 30, 2011, for $1.8 million. Instead of completing that transaction, however, law enforcement officers arrested Qazah and Alquza at Qazah's house, where they also executed a search warrant and recovered, among

other things, $1.3 million in cash and a notebook in which Qazah had recorded his cigarette sales to various retailers. That same day, officers executed another search warrant at Alquza's house, recovering, among other things, relevant financial records and false identification documents.

Prior to trial, Alquza filed a motion to suppress the evidence seized during the search of his house on the ground that the warrant authorizing the search incorporated an attachment, Attachment B, that described the items to be seized from Qazah's house, not Alquza's. At the hearing on the motion, the ATF agent who served as the lead case agent for the investigation and an Assistant U.S. Attorney acknowledged that, when they applied for the search warrant for Alquza's house, they mistakenly included the Attachment B they had prepared in connection with the search of Qazah's house. While both versions of Attachment B included a similar list of items to be seized, many of the items were linked to the particular defendant and his businesses, which were different in each Attachment B. The version of Attachment B attached to the warrant authorizing the search of Alquza's house included the following list of items, with the material in brackets showing what had been intended in lieu of the underlined material:

The following records, documents, and items that constitute evidence, contraband, fruits, and/or

instrumentalities of violations of Title 18 U.S.C. 1956(a)(3)(B):

1. Cash or United States currency, cigarettes, documentation of personal and business bank account numbers, bank statements, investment account statements, safety deposit boxes, and other financial statements for Kamal QAZAH and 7 Stars Auto [Nasser ALQUZA and May Hassouneh], or in nominee names, for the periods 2009 through current. Documentation will also include all written or electronic correspondences, canceled checks, deposit slips, and signature cards. Documentation of asset ownership for Kamal QAZAH and 7 Stars Auto [Nasser ALQUZA and May Hassouneh]. Furthermore, documentation showing the use of straw parties or fictitious names to conceal individual assets for the years 2009 through current.

2. All corporate and individual bookkeeping records and other financial records including balance sheets, deposit and withdrawal sheets, statements of assets, statements of cash flows, statements of liabilities, general ledgers, general journals, subsidiary ledgers, gross receipts, safety deposit box, cash receipts, disbursement records, accounts receivable and payable[,] ledgers and records [for] KQ LLC, City Food Mart LLC and Z and Z of Columbia LLC and 7 Stars Auto owned by Kamal QAZAH [Kamal, LLC, Complete Construction, LLC, and any other businesses owned by Nasser ALQUZA].

(Emphasis added). Both versions of Attachment B also included a third paragraph, which listed various types of "[d]igital [e]vidence" and did not mention either Qazah or Alquza.

Thus, the version of Attachment B that the ATF agent and the Assistant U.S. Attorney intended to include for Alquza's house would have specified documents relating to "Nasser ALQUZA and May Hassouneh" in paragraph one, rather than those relating to "Kamal QAZAH and 7 Stars Auto." And, in paragraph two, the correct attachment would have specified documents relating to

6

"Kamal, LLC, Complete Construction, LLC, and any other businesses owned by Nasser ALQUZA," rather than documents relating to "KQ LLC, City Food Mart LLC and Z and Z of Columbia LLC and 7 Stars Auto owned by Kamal QAZAH."

The Assistant U.S. Attorney testified that while he and the ATF agent had printed and included the wrong Attachment B in the packet that they physically brought to the magistrate judge to sign, he had previously emailed the entire search warrant and application for it to the magistrate judge's chambers and that this email version included the correct version of Attachment B for Alquza's warrant. When the ATF agent and Assistant U.S. Attorney went into the judge's chambers, the judge had the correct version of the documents open on her desk and looked down at them when she referenced a detail that had been included in the ATF agent's affidavit. She then asked the ATF agent for his copy of the warrant -- which contained the mistakenly switched Attachment B -- signed it, and handed it back to the ATF agent, who filed a copy with the clerk's office.

Government witnesses also testified that the search of Alquza's residence was conducted on the same day as the search of three additional locations in South Carolina, as well as the execution of 11 arrest warrants. In preparation for the "takedown," agents held a briefing that provided an overview of the investigation for the approximately 100 officers that would

7

be participating in the warrants' execution. In advance of the briefing, one of the undercover officers, using the correct version of Attachment B, prepared a summary list of the items for which the search team at Alquza's residence should be looking. The leader of that search team, Agent Sherry Hamlin, testified that she received that summary list at the briefing and relied on it when supervising the search. On the morning of the search, she also had a copy of the signed warrant, which contained the incorrect version of Attachment B. When she examined the warrant and its attachments, however, she noticed no discrepancy. She explained, "When I did look at the search warrant, I remember seeing the name 'Kamal [Qazah],' but I also kn[e]w that he was related to this investigation." She testified that it was only after she received a call from Alquza's wife following the search that she "looked at [the warrant] more closely and realized" the error.

Following the hearing, the district court denied the motion to suppress, finding as fact that the warrant's inclusion of the incorrect attachment was a clerical error. The court concluded that even if the error had rendered the warrant defective, the evidence recovered in the search was admissible under the good-faith exception to the exclusionary rule recognized in United States v. Leon, 468 U.S. 897 (1984).

At the six-day trial, the jurors heard extensive testimony from two of the undercover officers who had conducted the transactions with Qazah and Alquza and saw excerpts from recordings made by the officers. They also heard testimony from two coconspirators, who explained that they had purchased cigarettes from undercover officers and then immediately resold them to Qazah. Both of these witnesses testified that they understood the cigarettes to have been stolen and that they discussed that understanding with Qazah. Following the government's case in chief, Qazah testified on his own behalf and admitted that he had purchased more than 1,000 cases of cigarettes supplied by the undercover officers and that he had been planning on purchasing 1,300 cases directly from the undercover officers on the day that he was arrested. Qazah further admitted that the undercover officers had represented that the cigarettes they were supplying were stolen. Nonetheless, he maintained that, notwithstanding the officers' representations, he believed that the cigarettes were counterfeit, rather than stolen.

The jury convicted Qazah and Alquza of conspiracy, in violation of 18 U.S.C. § 371, by conspiring to receive, transport, and sell stolen property in interstate commerce, in violation of 18 U.S.C. §§ 2314 and 2315; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money

laundering, in violation of 18 U.S.C. § 1956(a)(3). Qazah was also convicted of receiving and selling property stolen in interstate commerce, in violation of 18 U.S.C. §§ 2315 and 21.

Following their convictions, the Probation Officer prepared a presentence report for each defendant. The report for Qazah recommended that he be held responsible for 8,112.66 cases of cigarettes, with a retail value of $24,337,980, and the report for Alquza recommended that he be held responsible for 2,909.66 cases, with a retail value of $8,728,980. Based on those loss amounts, the reports applied a 22-level enhancement to Qazah's offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(L) (2012), and a 20-level enhancement to Alquza's offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(K) (2012). The presentence report for Qazah also recommended applying a two-level adjustment to his offense level for obstruction of justice based on false statements that he made during his initial appearance before a magistrate judge.

Both defendants objected to the presentence reports' use of the cigarettes' retail value in calculating the loss amount, arguing that the cigarettes' wholesale value should have been used instead. Using wholesale value would have lowered each defendant's offense level by two levels. The district court, however, rejected the defendants' argument, relying on Application Note 3 of U.S.S.G. § 2B1.1 to conclude that the

10

cigarettes' retail value was the appropriate measure of loss. Qazah also objected to the application of a two-level enhancement for obstruction of justice, and the court also rejected that challenge. But in doing so, the court relied not on statements made by Qazah during his initial appearance, but on his testimony at trial that he did not think the cigarettes were stolen, finding that, by giving this testimony, Qazah had committed perjury.

After concluding that the correct Sentencing Guidelines range for Qazah was 235 to 293 months' imprisonment, the court sentenced him to 216 months' imprisonment. And after it concluded that the correct Sentencing Guidelines range for Alquza was 121 to 151 months, it imposed a sentence of 108 months' imprisonment.

These appeals followed.

II

Alquza first contends that the district court erred in denying his motion to suppress the evidence seized from his house, arguing that, "because the search warrant for [his] residence identified items and business entities that were exclusively associated with Qazah[,] [t]he warrant [did] not satisfy the Fourth Amendment's particularity requirement." He also contends that the district court erred in relying on the

11

good-faith exception to the exclusionary rule recognized in United States v. Leon, 468 U.S. 897 (1984), arguing that Leon's good-faith exception does not apply here (1) because "the magistrate judge fail[ed] to perform [her] proper, neutral and detached function"; and (2) because the warrant here was "so facially deficient that the executing officer could not reasonably have assumed the warrant was valid."

The government contends that, despite the inclusion of the wrong attachment, the search warrant for Alquza's house satisfied the Fourth Amendment's particularity requirement, as it described in detail the things to be seized, from whom they were to be seized, and from where they were to be seized, thereby providing sufficient guidance to executing officers. The government further contends that "even if the warrant were deficient [because of the inclusion of the incorrect version of Attachment B], suppression would not be appropriate" under Leon "because law-enforcement officers acted in good-faith reliance on the warrant" and because "the error did not involve the kind of wrongdoing that suppression could meaningfully deter."

The Fourth Amendment requires that, in the ordinary course, searches and seizures be conducted pursuant to a warrant issued "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. When

12

officers obtain a search warrant but the requirements of the Fourth Amendment are nonetheless violated, evidence recovered during the search may, in certain egregious cases, be excluded at trial, such as, for instance, when "the issuing magistrate wholly abandon[s] his judicial role" or when the warrant issued is "so facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923. But, in the ordinary course, the exclusion of evidence is not the proper remedy. See id. at 918 ("[S]upression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule"). The Leon Court held that, in the circumstances before it, the exclusionary rule should not be applied to bar the government from introducing "evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate," even though the warrant was ultimately found to be invalid. Id. at 900.

In this case, Alquza contends that two of the extreme circumstances recognized in Leon as justifying the exclusion of evidence obtained pursuant to a warrant apply here, arguing that the magistrate judge abandoned her judicial role in signing a

13

warrant containing the incorrect Attachment B and that the warrant therefore was so facially deficient that the executing officers could not have reasonably assumed that it was valid. We disagree.

The error in this case was a technical one, as the district court found, which did not influence the warrant's issuance, nor adversely affect its execution. Alquza does not contend that probable cause was lacking or that the applicant's affidavit misstated any facts. Nor does he identify any defect in the email version of the warrant that the magistrate judge reviewed to make her decision to issue it. Moreover, he does not complain that the actual search conducted or the items seized were unauthorized by the correct version of the warrant.

The record supports the district court's findings that the magistrate judge made her decision to issue the warrant based on the email copy that was sent to her by the Assistant U.S. Attorney and that the email version included the correct version of Attachment B. When she signed the physical copy of the warrant presented to her by the AFT agent and the Assistant U.S. Attorney, she assumed, as did the agent and the Assistant U.S. Attorney, that she was signing the same version. In addition, the search team executed the warrant by seizing items based on a summary list prepared from the correct version of the warrant. Consequently, both the issuance and the execution conformed to

14

the warrant as if it had contained the correct version of Attachment B. The only discrepancy in the process was that the actual warrant that was signed by the magistrate judge and given to Alquza contained the wrong version of Attachment B. The executing officer did not realize the discrepancy until after the search had been completed, when Alquza's wife called the officer.

In these circumstances, we conclude that the judicial officer did not wholly abandon her judicial role in issuing the warrant. See Leon, 468 U.S. at 923. Nor did she "merely rubber stamp[] the warrant." United States v. Gary, 528 F.3d 324, 329 (4th Cir. 2008). To the contrary, she examined the email version of the proposed warrant, which was the correct version, before deciding to sign it, although she unwittingly signed an incorrect version. And Alquza does not challenge the correct version that was considered by the judge.

We also conclude that the warrant was not so facially deficient as to preclude the officers performing the search from forming an objectively reasonable belief in its validity. See Leon, 468 U.S. at 923. The signed warrant correctly identified the place to be searched and included an Attachment B, albeit the incorrect one, that correctly listed many of the items to be seized. Moreover, when the executing officer looked at the signed version of the warrant, she saw Qazah's name but

15

reasonably concluded that its inclusion was not peculiar because she knew that Qazah was a central figure in the conspiracy. More importantly, the executing officer was not relying on her personal reading of the warrant's Attachment B to inform her of the items that her team was authorized to seize. Instead, she reasonably relied on the summary list that her colleagues had prepared and given to her in advance of the search -- a summary list that was based on the correct version of the search warrant. As a result, in actual fact, the officers of the search team executed the warrant in a manner that was both consistent with the warrant that they thought they had received and consistent with the warrant that the magistrate judge had intended to issue. In light of these circumstances, we conclude that the officers of the search team reasonably believed that the search that they were conducting was authorized by a valid warrant. See Massachusetts v. Sheppard, 468 U.S. 981, 990-91 (1984) (concluding that the evidence recovered during a search of the defendant's home need not be suppressed even though the warrant's description of the items to be seized was "completely inaccurate," id. at 988 n.5, as a result of a "technical error on the part of the issuing judge," id. at 984).

Most important to the analysis, however, is our conclusion that the suppression of evidence recovered in this case would have almost no deterrent effect because the officers were, at

16

bottom, acting in good faith. The Supreme Court has repeatedly explained that the exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations" and that exclusion is appropriate only when "the deterrence benefits of suppression . . . outweigh its heavy costs." Davis v. United States, 131 S. Ct. 2419, 2426-27 (2011). The Davis Court explained that the key to this balancing analysis is the relative culpability of the police officer's conduct:

> The basic insight of the Leon line of cases is that the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue. When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

Id. at 2427-28 (emphasis added) (internal quotation marks, alterations, and citations omitted); see also Herring v. United States, 555 U.S. 135, 144 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system").

Given that the officers here were, at most, guilty of simple negligence in failing to recognize the document-assembly

17

error before executing the warrant and that, in any event, they acted in good faith, <u>Leon</u> and its progeny compel the conclusion that the district court correctly denied Alquza's motion to suppress.

III

The defendants' other significant issue on appeal arises from their contention that the district court erred in enhancing their offense levels and, consequently, their sentencing ranges under the Sentencing Guidelines by holding them accountable for a loss under U.S.S.G. § 2B1.1(b)(1) based on the <u>retail</u> value of the purportedly stolen cigarettes. The defendants maintain that the district court was, instead, required to use the cigarettes' <u>wholesale</u> value, which would represent the loss sustained by the cigarettes' manufacturer, from whom the cigarettes were purportedly stolen.

In rejecting the wholesale value of the cigarettes as the appropriate measure of loss, the district court relied on U.S.S.G. § 2B1.1(b)(1) and Application Note 3(A) to conclude that it should apply the "greatest intended loss" as between the wholesale and retail value of the cigarettes, regardless of whether that value in fact represented a loss. As the court explained:

> [Y]ou go to intended loss. And under intended loss you look at what is the greatest intended loss,

18

particularly with a government sting operation where
you have no loss.  So isn't the issue were they going
to be selling them wholesale or <u>are they knowingly
going to be pushing them further down to get to retail
outlets</u>?

*    *    *

[I]t is the Probation Office's position that . . . the
greater intended loss would ultimately be retail.

*    *    *

The court, for the reasons raised by the United States
and the Probation Office, as well as this own court's
discussion of the sentencing guidelines, finds that
<u>the appropriate value is retail value for determining
the loss amount</u>.

(Emphasis added).

When questioned by counsel for the defendants about where

the court derived the conclusion that it must apply the greatest

value, the court directed counsel to both U.S.S.G. § 2B1.1(b)(1)

and the Application Notes under it, stating:

Apply -- the greatest is under 2B1.1(b)(1).  And then
you look by the word "loss" and it says apply the
greatest.   So  it  is  greater  intended  loss  [as
indicated in Application Note 3(A)].

*    *    *

Apply  the  greatest.   That's  where  it  comes  from.
Loss.   Apply  the  greatest.   So  that's  greatest
intended loss.  All right.

Accordingly,  the  court  concluded  that  the  loss  resulting

from  the  defendants'  offenses  should  be  based  on  the  retail

value  of  $3,000  per  case,  as  distinct  from  the  wholesale  value

of  $2,126  per  case.   The district court's use of retail value,

19

as opposed to wholesale value, increased both defendants' offense levels by two levels and consequently increased their recommended sentencing ranges.

As recognized by the district court, the defendants' offense levels are properly determined under U.S.S.G. § 2B1.1(b)(1), which correlates a defendant's offense level with the amount of the "actual loss" or the "intended loss" resulting from the commission of an offense. See U.S.S.G. § 2B1.1 cmt. n.3(A). In this case, because the defendants' offenses occurred during the course of an undercover sting operation, the parties agree, as did the district court, that the "intended loss," rather than the "actual loss," is the relevant measure. See id. § 2B1.1 cmt. n.3(A)(ii).

In the version of the Sentencing Guidelines used in sentencing the defendants, the Application Notes explain that the "intended loss" is determined by "the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii) (2012) (emphasis added).* The Notes provide further that "[t]he court need only make a reasonable estimate of the loss" and that its estimate "shall be based on available information, taking into account, as appropriate and practicable

---

* Effective November 1, 2015, the Sentencing Commission amended Application Note 3(a) to define "intended loss" as "the pecuniary harm that the defendant purposefully sought to inflict." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii).

under the circumstances," a number of factors, including "[t]he fair market value of the property unlawfully taken" and "[t]he approximate number of victims multiplied by the average loss to each victim." Id. § 2B1.1 cmt. n.3(C). Thus, as we have observed previously, "[t]he general rule is that loss is determined by measuring the harm to the victim" of the offense committed. United States v. Ruhe, 191 F.3d 376, 391 (4th Cir. 1999); see also id. at 380, 390-92 (applying the rule to determine loss resulting from the crime of transporting stolen property in interstate commerce). The victim, of course, is determined by the nature of the offense and the impact of its violation.

The relevant offense for this determination of loss is the charge that the defendants participated in a conspiracy to receive, transport, and sell stolen goods -- specifically, over 8,000 cases of Marlboro cigarettes manufactured by Philip Morris -- in violation of 18 U.S.C. §§ 2314 and 2315. Even though the cigarettes were not in fact stolen, but were instead supplied to the defendants by undercover agents in a sting operation, the defendants were told -- and they believed -- that they were receiving cigarettes stolen from Philip Morris trucks in either Virginia or Tennessee. See 18 U.S.C. § 21 (defining stolen property to include property which was represented by law

21

enforcement and persons under their direction to be stolen and which the defendant believed to be stolen).

Thus, for the purpose of determining the loss that was intended to result from the offense, see U.S.S.G. § 2B1.1 cmt. n.3(A)(ii), the court must identify and focus on the intended victim or victims of the offense of receiving and selling stolen property. Had the cigarettes actually been stolen, the most obvious victim would have been the property's true owner, which the defendants believed to be Philip Morris, the cigarettes' manufacturer. This makes Philip Morris the most obvious intended victim of the conspiracy offense. And Philip Morris' loss would have been the amount of money that it would have otherwise received for selling the purportedly stolen cigarettes, a figure that the record indicates was an average of $2,126 per case.

But Philip Morris was not necessarily the only intended victim of the defendants' scheme. For example, other potential intended victims might well have included the States that were denied cigarette taxes that otherwise would have been paid in this case, at roughly $300 per case. It is also conceivable that the defendants and their coconspirators intended to harm legitimate retailers by enabling conspiring retailers to sell the cigarettes at a discount, thus possibly depriving legitimate retailers of sales as a result. If legitimate retailers were

22

found to be among the class of intended victims, then it would likely have been appropriate for the district court to estimate their losses in its loss calculations as well.

These questions about the identity of the intended victims and their losses are ultimately questions of fact for the district court to resolve as part of its loss calculations under the Sentencing Guidelines.

The district court in this case appeared to conclude, without making any such inquiries, that the cigarettes' retail market value was the appropriate measure of loss simply because the Guidelines required it to apply the "greater intended loss," and the cigarettes' retail value was greater than their wholesale value. We do not suggest that the retail value of the cigarettes is necessarily an incorrect measure here, but the district court did not explain how the retail value represented loss. Rather, it justified its use of retail value on the ground that the defendants intended, in their scheme, to sell the cigarettes at retail. That the defendants sold the cigarettes at retail, however, does not necessarily indicate that the retail value is an approximate measure of loss. Loss, by definition, would require a victim and would represent an amount that is lost or taken away from the victim. See Merriam-Webster's Collegiate Dictionary 736 (11th ed. 2007) (defining "loss" and "lost"). This is consistent with what the Sentencing

23

Guidelines provide and with what we have previously held. See Ruhe, 191 F.3d at 391. In this limited respect, we therefore conclude that the district court's reasoning was in error. See, e.g., United States v. Machado, 333 F.3d 1225, 1228 (11th Cir. 2003) (joining other circuits in concluding that loss must be measured "within the factual circumstances presented" and therefore may not necessarily be the property's retail market value). Accordingly, we vacate the defendants' sentences and remand for resentencing, allowing the district court to expand its inquiry into the intended victim or victims of the relevant offenses and to recalculate the defendants' sentencing ranges based on its findings and conclusions about the amount of loss that they intended to result from their commission of the offense or offenses.

IV

Finally, the defendants contend that the district court erred in making several other rulings during trial and sentencing. We affirm each, however, concluding that they merit only brief discussion.

First, Alquza contends that the district court abused its discretion by allowing the government to present (1) evidence of statements he made to the undercover officers about his prior experience dealing with stolen goods and (2) evidence of false

24

identification documents recovered during the search of his home. He argues that the district court should have excluded this evidence under Federal Rule of Evidence 404(b)(1), which specifies that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The Rule provides further, however, that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); see also United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997). In the context of this case, we conclude that the district court acted within its discretion in admitting the challenged evidence under Rule 404(b)(2).

Second, Alquza contends that the district court abused its discretion by allowing the government to present evidence that the Federal Reserve Board had investigated the large sums of money being wired overseas to Jordan through a bank account that Alquza jointly controlled, maintaining that this evidence was both "completely irrelevant" and "highly prejudicial." The district court correctly concluded, however, that Alquza's counsel opened the door to this evidence by asking one of the undercover officers whether there was any evidence that Alquza "was wiring hundreds of thousands of dollars in and out of the

25

United States."  Again, we conclude that the district court acted within its discretion in admitting this evidence.

Third, Qazah contends that the district court abused its discretion in denying his motion to sever his trial from Alquza's.  He bases this argument on the district court's admission of evidence seized during the search of Alquza's house, as well as its admission of evidence concerning Alquza's prior illegal conduct.  Qazah argues that this evidence would not have been admissible had he been tried alone; that it "had an unfair tendency to cast [him] in a bad light with the jury"; and that the district court was therefore compelled to grant a severance to enable him to receive a fair trial.  This argument, however, lacks any merit.  When defendants are properly charged together, a district court should grant severance under Federal Rule of Criminal Procedure 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro v. United States, 506 U.S. 534, 539 (1993).  Because Alquza comes nowhere close to satisfying this standard, the court correctly denied his motion to sever.

Fourth, Qazah contends that the district court erred at sentencing by applying a two-level adjustment for obstruction of justice under U.S.S.G. § 3C1.1, based on its conclusion that

26

Qazah committed perjury when he testified at trial that he thought the cigarettes were counterfeit, rather than stolen. Specifically, Qazah maintains that the district court erred by applying the enhancement without making factual findings that he (1) gave false testimony, (2) concerning a material matter, (3) with the willful intent to deceive. See United States v. Dunnigan, 507 U.S. 87, 95 (1993) (holding that when a district court bases an obstruction of justice enhancement on the defendant's trial testimony, the court must "make[] a finding of an obstruction of . . . justice that encompasses all of the factual predicates for a finding of perjury"); United States v. Perez, 661 F.3d 189, 193 (4th Cir. 2011) (concluding that, under Dunnigan, "[i]f a district court does not make a specific finding as to each element of perjury, it must provide a finding that clearly establishes each of the three elements"). We conclude, however, that the district court's findings that Qazah obstructed justice sufficiently "encompasse[d] all of the factual predicates for a finding of perjury." Dunnigan, 507 U.S. at 95. First, the court found that Qazah actually knew the cigarettes were stolen, despite testifying at trial that he thought they were counterfeit, thus establishing the first element of perjury -- i.e., that Qazah gave false testimony. The court further found that whether Qazah thought he was handling stolen cigarettes or counterfeit cigarettes "was the

27

central issue for the jurors," thus establishing the materiality of the false testimony. And, finally, the willfulness element of perjury was encompassed by the court's findings that Qazah had "categorically denied" knowing that the cigarettes were stolen and that this denial was the "core of his testimony."

Fifth, and finally, both defendants challenge the reasonableness of their sentences. Specifically, Qazah contends that his sentence of 216 months' imprisonment is "greater than necessary" and that the district court "placed undue emphasis on the seriousness of the offense and general deterrence" in arriving at that sentence. Alquza similarly argues that the district court failed "to make adequate findings of the 18 U.S.C. § 3553(a) factors." We find no merit to either of these contentions. Throughout the sentencing hearings, the district court explained its chosen sentences by reference to the § 3553(a) factors, and the defendants have not shown that the district court abused its discretion in selecting an appropriate sentence in light of those factors. See Gall v. United States, 552 U.S. 38, 41 (2007).

* * *

In sum, we affirm both defendants' convictions but vacate their sentences, remanding to allow the district court to

28

reevaluate its loss finding in light of our opinion and to resentence the defendants.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RESENTENCING