**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4379**

UNITED STATES OF AMERICA,

               Plaintiff – Appellee,

     v.

KEESHAWN BRANCH,

               Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Henry E. Hudson, District Judge.  (3:15-cr-00197-HEH-1)

Submitted:  June 5, 2017                     Decided:  July 18, 2017

Before AGEE, THACKER, and HARRIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Geremy C. Kamens, Federal Public Defender, Caroline S. Platt, Appellate Attorney, Nia A. Vidal, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Dana J. Boente, United States Attorney, Alexandria, Virginia, Stephen W. Miller, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

After the district court denied Keeshawn Branch's motion to suppress drug evidence and motion for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978),[1] he entered a conditional guilty plea—pursuant to a written plea agreement—to possession with intent to distribute cocaine base, a violation of 21 U.S.C. § 841. On appeal, Branch challenges both pretrial rulings. For the reasons that follow, we affirm the judgment of the district court.

## I.

### A.

#### 1.

Because the district court denied Branch's motion to suppress, we review the facts in the light most favorable to the Government. *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004).

In April 2015, Branch allegedly was involved in the murder of Rolan Angaroo ("Rolan"). Several days before his murder, Rolan and a co-conspirator, Juan Dehaney, took Branch's safe from the home of Branch's girlfriend, Magda Adames, on Edge Hill Road in Richmond, Virginia. Branch lived with Adames at the Edge Hill Road residence part time, splitting his time between Adames' home and his grandmother's.

---

[1] Under *Franks*, the accused may be "entitled to an evidentiary hearing on the veracity of statements in the affidavit" supporting a search warrant. *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011).

Shortly after the robbery, Branch began to threaten Dehaney. First, Branch attempted to confront Dehaney personally and demand return of the safe. But when Branch went to Dehaney's home, which he shared with Rolan, neither Dehaney nor Rolan were there. Instead, Branch left a threatening message with one of Rolan's relations, Joshua Angaroo ("Joshua"). Branch later sent Dehaney threatening text messages from a cellphone number with the prefix 309 (the "309 number").

Three days after the safe robbery, Rolan was murdered. Just before the shooting, and immediately thereafter, witnesses saw Branch's car near the scene.

2.

Based on the connection between Branch and Rolan, Branch became the prime suspect in Rolan's murder. Eventually the Richmond police obtained a warrant for Branch's arrest.

In the meantime, Richmond police also obtained a warrant for Adames' arrest on unrelated charges. And in June 2015, Richmond police arrived at Adames' new home— on Campbell Avenue in Richmond—to arrest her.

While serving the arrest warrant on Adames, Richmond police encountered and arrested Branch, who was with Adames at the Campbell Avenue residence. Though the police arrested Branch at 11:00 a.m., they believed—and he now concedes—that he had spent the previous night at the Campbell Avenue residence with Adames.

Following Branch's arrest, Detective Christopher Foultz, along with his partner Detective Anthony Coates, obtained a search warrant for the Campbell Avenue residence to look for the weapon used in Rolan's murder. Foultz executed the affidavit in support

3

of that search warrant (the "first search warrant") based on information provided to him by Coates, which recounted the facts set out above. As relevant to this appeal, the affidavit stated that Branch "resided" with Adames first at the Edge Hill Road residence and later at the Campbell Avenue residence; that Adames had confirmed during an April 2015 interview that the safe taken from the Edge Hill Road residence belonged to Branch; that Joshua had identified Branch as the person who threatened Dehaney; and that, in April 2015, Adames, as well as Branch's mother and grandmother, had confirmed that Branch used the 309 number. A magistrate judge approved and issued the first search warrant.

When Foultz and Coates executed the first search warrant, they did not discover any evidence of Rolan's murder; however, their search was not fruitless. While searching the Campbell Avenue residence, Foultz and Coates found evidence of drug distribution—cocaine base, cash, and a firearm—hidden in a closet. The first search warrant thus spurred Foultz to swear out an affidavit in support of a second search warrant to search the Campbell Avenue residence for additional evidence of drugs.

That second search warrant (the "second search warrant") produced even more evidence of drug distribution. All told, after executing the second search warrant, Foultz and Coates had found a total of 13 grams of cocaine base, in addition to other drug paraphernalia. After the second search concluded, Branch admitted that the cocaine base belonged to him.

B.

Based on the evidence obtained in the search of the Campbell Avenue residence, the Government indicted Branch in the United States District Court for the Eastern District of Virginia. The indictment charged Branch with one count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841. Branch responded to the charges with a motion to suppress the drug evidence.

Search warrants must be supported by a proffer of probable cause—that is, the affidavit in support must demonstrate "a fair probability that contraband or evidence of a crime will be found in the particular place [to be searched]." *See United States v. Doyle*, 650 F.3d 460, 472 (4th Cir. 2011); *see also id.* at 466–67. *See generally* U.S. Const. amend. IV. Branch contended that probable cause did not support the first search warrant because it failed to suggest any meaningful connection between himself and the Campbell Avenue residence, and because it failed to demonstrate a fair probability that the weapon used in Rolan's murder would be found there. Further, Branch argued that because probable cause did not support the first search warrant and because the second search warrant had been obtained based solely on evidence uncovered during the execution of the first, the court should suppress all the evidence obtained during the execution of the second search warrant as well as the incriminating statements made after his arrest. *See United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002) ("Generally, evidence derived from an illegal search or arrest is deemed fruit of the poisonous tree and is inadmissible.").

Before the district court ruled on Branch's motion to suppress, he moved for a hearing under *Franks v. Delaware*. Branch contended that Foultz' affidavit in support of the first search warrant contained false statements or misleading omissions that were made at least with reckless disregard for the truth. His argument broadly attacked four allegedly material misstatements or omissions. *First*, Branch contended that Foultz falsely claimed that he lived with Adames—at both the Edge Hill Road and Campbell Avenue residences—despite the fact that Foultz knew Branch lived with his grandmother. *Second*, he argued that Foultz attributed the safe taken from the Edge Hill Road residence to Branch without any evidence to support that conclusion. Branch acknowledged that Adames told police that the safe was his, but suggested that Adames' admission was the product of coercion or police misconduct. *Third*, Branch maintained that Foultz had no evidence that Branch was the one who threatened Dehaney to return the safe. As Branch sees it, the only evidence Foultz had of Branch's identity was a statement from Joshua, but Joshua misidentified Branch to the police—he claimed that the man who threatened Dehaney had short hair, while Branch had long hair at the time. *Fourth*, Branch asserted that Foultz had no evidence that he owned or used the 309 number used to send Dehaney threatening text messages. Branch contended that Foultz claimed that Adames, as well as Branch's mother and grandmother, had confirmed that he used the 309 number, when the mother and grandmother had not done so. And although Branch acknowledged that Adames had told police he owned the 309 number, he again implied that her admission was the product of coercion.

Following a hearing, the district court denied both of Branch's motions in open court. On Branch's motion to suppress, the court concluded that, even if Foultz' affidavit did not support a finding of probable cause, the evidence was admissible under the good-faith exception to the exclusionary rule. *See generally United States v. Leon*, 468 U.S. 897 (1984). In particular, the district court opined that, although the affidavit "could have had more details," the information in it was "on its face correct" and "there was simply nothing here that would warrant [Foultz and Coates] in not crediting [the magistrate's probable cause] determination." J.A. 141. On the motion for a *Franks* hearing, the district court started by noting that Foultz "weigh[ed] the evidence and put that which he . . . believe[d] [wa]s consistent with the facts" into the affidavit. J.A. 123. The court observed that the affidavit contained some facts "that perhaps [a]re inaccurate," but excused those inaccuracies because "exactitude is not . . . the test this Court employs." J.A. 123. The court concluded "that the detectives acted in good faith . . . [and] that nothing in the affidavit shows knowing and intentional falsehood[s]" or statements made with "reckless disregard for the truth." J.A. 123–24.

Following the district court's rulings, Branch pleaded guilty, pursuant to a written plea agreement, reserving the right to appeal the district court's decision on his motion to suppress and the *Franks* motion. The district court sentenced Branch to a term of imprisonment and he timely noted this appeal. We have jurisdiction under 28 U.S.C. § 1291.

7

II.

We review first Branch's challenge to the district court's suppression ruling. "When considering on appeal a motion to suppress evidence, we review a district court's factual findings for clear error and its legal determinations de novo." *Perkins*, 363 F.3d at 320.

A.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched." U.S. Const. amend. IV. Thus, in most circumstances, the police may search a suspect's home only when a neutral, detached magistrate issues a warrant after concluding that probable cause exists to believe contraband will be found in the place to be searched. *See Illinois v. Gates*, 462 U.S. 213, 238–39 (1983). When evidence is obtained without probable cause, it often is inadmissible at trial under the exclusionary rule. *See Doyle*, 650 F.3d at 466–67.

Despite the general rule, suppression of evidence improperly seized is not mandatory in all circumstances. For example, "when an officer acting in objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," evidence obtained with that warrant is admissible at trial even if the warrant is later found to be invalid. *Leon*, 468 U.S. at 920; *accord United States v. Qazah*, 810 F.3d 879, 886 (4th Cir. 2015). This "good-faith exception" allows for admission unless "a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir.

8

2011) (internal quotation marks omitted).[2] The good-faith standard applies in most cases, except those where the affidavit provides only minimal, vague information. *Cf. United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) ("We find that the good-faith exception to the exclusionary rule should not apply in this case due to the 'bare bones' nature of the affidavit[.]"). Indeed, "[s]earches pursuant to a warrant . . . rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994) (internal quotation marks omitted).

## B.

On appeal, Branch contends that Foultz and Coates did not rely on the magistrate's probable cause determination in good faith because no reasonable officer would have believed that the weapon used in Rolan's murder would be found at the Campbell Avenue residence. This is so, he posits, for two reasons. First, Branch argues that the affidavit offers no evidence to connect him to the Campbell Avenue residence other than the conclusory assertion that he "resided" there. Second, he contends that the affidavit provides no facts to suggest that he stored the murder weapon there. Applying *Leon*'s good-faith exception, we disagree.[3]

---

[2] The good-faith exception also does not apply in other circumstances not relevant here. *See United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) (listing those other circumstances).

[3] The district court did not determine whether probable cause supported the first search warrant and instead elected to proceed directly to the good-faith exception. The district court's (Continued)

Based on the information in the affidavit, in connection with the background information known to Foultz, he and Coates reasonably could have believed that Branch lived at the Campbell Avenue residence. To determine whether an officer acted in good faith, we may "look outside the four corners of a deficient affidavit when determining, in light of all the circumstances, whether an officer's reliance on the issuing warrant was objectively reasonable." *McKenzie-Gude*, 671 F.3d at 459. In other words, we may look to all the information known to the officer or officers executing the warrant. *See id.*

While Foultz' affidavit in support of the first search warrant does not provide exhaustive detail, the universe of facts known to both Foultz and Coates support the conclusion that they believed in good faith that Branch lived at the Campbell Avenue residence. In an April 2015 police interview, Branch admitted to Coates that he lived with Adames at the Edge Hill Road residence, calling it "home." J.A. 111; *see also* J.A. 76 (indicating that Coates interviewed Branch on April 19, 2015). Because Foultz had reason to believe that Branch lived with Adames in April, he could reasonably assume that Branch and Adames continued to live together only two months later. That assumption was especially reasonable here as Branch spent the previous night at the Campbell Avenue residence and Foultz and Coates found him there when they showed

---

analysis was permitted under circuit precedent. *See, e.g.*, *United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994) ("[A] reviewing court may proceed to the good faith exception without first deciding whether the warrant was supported by probable cause."). We likewise proceed directly to the good-faith issue.

up to serve the arrest warrant on Adames. Against this background, Foultz acted reasonably when he concluded that Branch lived at the Campbell Avenue residence.

Branch disputes this conclusion and directs us to *United States v. Powers*, 1 F. Supp. 3d 470 (M.D.N.C. 2014), which he contends counsels the opposite conclusion. Whatever limited persuasive effect *Powers*—a district court decision—might have in another case, it has none here as it is factually inapposite. In *Powers*, the police obtained a search warrant for the defendant's home based entirely on the transitory presence of a third party wanted in connection with a weeks-old robbery, one to which the defendant had no connection. When the search uncovered the defendant's drugs and the Government indicted him, he moved to suppress the evidence and the district court granted his motion. The district court concluded that even good faith could not save the warrant authorizing the search because it was unreasonable for the police to "believe that evidence of a crime could be found at every place a suspect visited during the month following the commission of the crime." *Id.* at 477.

*Powers* bears no resemblance to this case. Unlike *Powers*, where the warrant was issued based on the suspect's *transitory presence*, here, Foultz reasonably believed that Branch *lived* at Adames' Campbell Avenue residence. In April 2015, Branch admitted he shared a "home" with Adames. J.A. 111. In light of Branch and Adames' past, when police discovered Branch at Adames' Campbell Avenue residence only two months later, it was reasonable for Foultz to conclude that Branch lived there.

We likewise conclude that Foultz and Coates reasonably believed that the weapon used in Rolan's murder likely would be found in the Campbell Avenue residence. In

11

*United States v. Anderson*, 851 F.2d 727 (4th Cir. 1988), which also concerned a search for a murder weapon, we held that, given "the nature of [a firearm] and the normal inferences of where one would likely keep such evidence," a suspect's home is the most natural place to search for one. *Id.* at 729. The same logic applies here. As discussed above, Foultz reasonably believed that Branch lived at the Campbell Avenue residence. Under *Anderson*, it follows that Foultz reasonably believed that, if Branch had a firearm, it was hidden at his residence.

Branch disputes *Anderson*'s applicability by pointing out that, here, almost two months had passed since Rolan's murder, while the amount of time between the murder and the search in *Anderson* was less—only one and one half months. Though true that this case involves slightly more time than *Anderson*, it is not materially different and we see no error in the district court's conclusion that the good-faith exception applied. *See, e.g.*, *United States v. Beckett*, 321 F.3d 26, 33 (1st Cir. 2003) (concluding that a "six-year lag between [a] 1995 murder and the search [of the defendant's residence]" only "somewhat diminishe[d] the likelihood that [the defendant] would have retained the murder weapon").

In sum, the district court did not err when it denied Branch's motion to suppress under *Leon*'s good-faith exception to the warrant requirement.

III.

We next turn to Branch's *Franks* argument. We review the district court's denial of a motion for a *Franks* hearing de novo. *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008).

A.

In *Franks v. Delaware*, the Supreme Court held that in certain "circumstances a defendant can attack a facially sufficient affidavit." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). A criminal defendant is entitled to a *Franks* hearing if he offers proof that makes a "substantial preliminary showing that a false statement [or misleading omission] knowingly or intentionally, or with reckless disregard for the truth, was included [or excluded] by the affiant in the warrant affidavit." *Id.; see also id.* at 301. When a defendant asks for a *Franks* hearing on the basis of an omission, he must show that "the omission [was] designed to mislead or [was] made in reckless disregard of whether it would mislead." *Tate*, 524 F.3d at 455 (internal alterations and quotation marks omitted). In all circumstances, falsity alone is not enough to warrant a hearing. The false inclusion or omission also must be "essential to the probable cause determination"; if "there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Colkley*, 899 F.2d at 300.

B.

Here, Branch raises the same four challenges as before the district court. In particular, Branch contends that Fultz misstated: 1) where Branch lived, and that he lived with his grandmother, not Adames; 2) the fact that Branch owned the safe stolen by

13

Rolan and Dehaney; 3) the fact that Branch went to Rolan and Dehaney's shared home to threaten Dehaney; and 4) Branch's use of the 309 number. Viewed in the light of the full record, Branch's contentions are not credible, and we affirm the judgment of the district court.

Branch first challenges Foultz' characterization that he "resided" with Adames, initially at her Edge Hill Road residence and finally at her Campbell Avenue residence. Though Branch contends that Foultz' statement that he resided at the Edge Hill Road residence was made with reckless disregard for the truth, it plainly was not given Branch's April 2015 admission to Coates that the Edge Hill Road residence was "home." J.A. 111. Moreover, in view of Branch's April 2015 statement, and given that, in June 2015, Foultz and Coates discovered Branch and Adames at the Campbell Avenue residence under circumstances that indicated Branch had spent the previous night there, it was not reckless for Foultz to assume that Branch lived at the Campbell Avenue residence. Finally, although Branch maintains that he lived only with his grandmother, his own evidence suggests that he lived with his grandmother no more than half of the time. J.A. 81 (attesting that Branch "spent the night with [his grandmother] three to four times a week"). We previously have concluded that an individual may have multiple residences. *See United States v. Grossman*, 400 F.3d 212, 218 (4th Cir. 2005) ("Despite Grossman's protests, therefore, these searches are not invalid merely because he splits his time among several different homes").

Branch next challenges as false Foultz' statement that he owned the safe. But that argument similarly founders. Adames admitted that the safe was Branch's. And

14

although Branch suggests that Adames' admission was the product of coercion or police misconduct, he has not provided any evidence to substantiate that claim. *Tate*, 524 F.3d at 454 (observing that, under *Franks*, the defendant bears the burden of producing affidavits or sworn statements to support his claim).

Branch also argues that Foultz recklessly disregarded the truth when he stated that Branch went to Rolan and Dehaney's home to threaten Dehaney and recover the safe. But that contention is meritless. For one thing, Branch *admitted* that he went to Dehaney's home shortly before Rolan's murder, he just contends he never threatened Dehaney. But Joshua, who received the threat on Dehaney's behalf, indicated that the man he identified as Branch claimed the safe as his. Taking Branch's admission and Joshua's recollection in concert with Adames' admission that the safe belonged to Branch, he cannot now seriously contend that it was reckless, or even unreasonable, for Foultz to conclude that Branch had threatened Dehaney. Moreover, to the extent Branch tries to cast doubt on Joshua's description of Branch as having short hair—because Branch now claims he had long braids at the time—the record contains no indication that Branch ever submitted any affidavit or sworn statement to properly contest that point. *See id.*

Lastly, Branch argues that Foultz overstated the facts that connected Branch to the 309 number. In particular, although the affidavit indicates that Adames, Branch's mother, and Branch's grandmother all affirmatively stated that Branch used the 309 number, Branch suggests that Adames' admission of that fact was coerced. Branch also argues that neither his mother nor his grandmother ever actually confirmed that fact.

15

With regard to Branch's coercion argument, he again has offered nothing more that supposition to support it. As discussed above, Branch's supposition, without any affidavit or other credible evidence, is not enough to make the required strong showing. *See id.* Moreover, with regard to statements made by Branch's mother and grandmother, while it may be debatable whether either woman confirmed Branch's ownership or use of the 309 number, those statements are not material under *Franks*. Even if the affidavit affirmatively misstates this point, Adames' admission still stands. Therefore, the affidavit's statements concerning Branch's mother and grandmother were superfluous to the magistrate's probable cause determination. *See Colkley*, 899 F.2d at 300 (observing that to warrant a *Franks* hearing, the false statement must be "essential to the probable cause determination" and if remaining content is sufficient to support the warrant, "no hearing is required").

We therefore conclude that no ground advanced by Branch in support of his appeal of the district court's ruling on his *Franks* motion has merit. The district court did not err in denying that motion.

IV.

Based on the foregoing, the judgment of the district court is

*AFFIRMED.*

16